**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
CIVIL ACTION NO.  3:19-cv-825-CRS
JUDGE    Senior Judge Charles R. Simpson III
MAGISTRATE JUDGE

*ELECTRONICALLY FILED*

**HENRY J. KAPLAN, M.D.**                                        **PLAINTIFF**
**44 Kingsbury Place**
**St. Louis, Missouri 63112**

**v.**

**UNIVERSITY OF LOUISVILLE**                              **DEFENDANTS**
**Office of University Counsel**
**University of Louisville**
**Louisville, Kentucky 40292**

**SERVE:**        **Thomas A. Hoy**
                **Registered Agent**
                **University of Louisville**
                **Grawemeyer Hall, Suite 206**
                **2301 S. Third Street**
                **Louisville, Kentucky 40292**

**–AND–**

**TONI M. GANZEL, M.D.**
**2513 Poplar Crest Road**
**Louisville, Kentucky 40207**

**–AND–**

**RONALD I. PAUL, M.D.**
**6502 Mount Batten Court**
**Prospect, Kentucky 40059**

**–AND–**

**GREGORY C. POSTEL, M.D.**
**1912 Mockingbird Bluff Lane**
**Louisville, Kentucky 40207**

## COMPLAINT

## JURY TRIAL DEMANDED HEREIN

Plaintiff Henry J. Kaplan, M.D. ("Plaintiff" or "Dr. Kaplan"), by counsel, for his
Complaint against Defendant University of Louisville ("University"), Defendant Toni M.
Ganzel, M.D., Defendant Ronald I. Paul, M.D., and Defendant Gregory C. Postel, M.D. (all
collectively referred to as the "Defendants"), hereby states as follows:

### PRELIMINARY ALLEGATIONS

1.      Dr. Kaplan, the long-standing Chair of the University's Department of
Ophthalmology and Visual Sciences (the "Department"), has been illegally targeted and harmed
by the University after doing nothing more than satisfying his obligations to protect and advance
the needs of the Department.

2.      In May 2018, the University informed the Department that its faculty clinicians
would have to take a significant salary cut, and that several research faculty and staff would have
to be terminated.  These funding cuts resulted from financial malfeasance by University
administration, as well as fiscal incompetence by University of Louisville Physicians ("ULP"),
particularly revenue cycle management.

3.      In response, Dr. Kaplan and his faculty began brainstorming and exploring
potential options for new revenue sources in order to avoid losing the Department's existing
outstanding clinicians and researchers, especially those who were not subject to non-compete
agreements, to more financially attractive positions, and at the same time, to protect the
Department's ability to attract top clinical residents and research fellows into the Department's
academic programs.

4.      One source of potential revenue in the medical field for the Department is to sell
its clinical practice to a private equity group, and to use such funds to establish a new

endowment for the Department's academic activities. In conjunction with appropriate financial support from University of Louisville Hospital ("ULH") for the faculty's 24/7 coverage of the emergency department at ULH, as well as retention of School of Medicine ("SOM") base salary support for clinical and research faculty members, the Department would be able to meet its mission of outstanding clinical, research and educational performance for the citizens of the Commonwealth and for its commitment to the Kentucky Lions Eye Foundation ("KLEF"), whose generous financial support established and continues to support the Kentucky Lions Eye Center. The Department and Dr. Kaplan were well-aware any such arrangement would require University approval and participation, which would be sought if it was believed the right private equity financial opportunity was found.

5.      At the behest of his Department, knowing that similar ophthalmology clinical practices at other universities had been purchased by private equity groups after agreement to a financial arrangement with their respective university, Dr. Kaplan began a process of information gathering from potential investment groups.

6.      Somehow the University was informed of the Department's alternative funding source research. Offended by Dr. Kaplan's temerity to explore a better funding arrangement for his Department, as opposed to simply relying on the University's reduced funding (and its presumed continued decline), the various Defendants intentionally and illegally took one or more actions, individually or together with one or more Defendants, to retaliate against Dr. Kaplan.

7.      Among other actions, and as described below, Dr. Kaplan was: removed as Chair of the Department and placed on administrative leave pending an ongoing "investigation" by the University's Risk, Audit, and Compliance Office ("Audit Services"); blocked from treating his patients by being forbidden from being on University clinical property and not allowed to inform

them of the reason for his inability to see them; and halted from his research activities by being prohibited from having any contact with other University collaborators to discuss or participate in research.

8.      Defendants' actions had immediate, negative, adverse impacts on Dr. Kaplan's career and livelihood, and have harmed his professional reputation, good name, honor, and integrity.

9.      Effectively, Defendants' actions terminated Dr. Kaplan's 40-year clinical career by preventing him from engaging in his ULP clinical practice, or even informing those patients of his impending absence, and terminated Dr. Kaplan's ongoing 40-year scientific research career, by preventing him from serving as Principal Investigator of his federal (i.e. NIH) and private funded research grants, as well as forbidding him to maintain his on-going collaboration with departmental research faculty members whose NIH research proposals were in development and close to submission.

10.     Accordingly, Dr. Kaplan comes to this Court seeking relief from the Defendants' illegal actions.

## THE PARTIES

11.     Dr. Kaplan is an individual whose primary residential address is 44 Kingsbury Place, St. Louis, Missouri 63112.  At all times relevant to this Complaint, Dr. Kaplan was a tenured professor at the University and served as the Chair of the Department for the University's SOM.

12.     The University is a non-profit Kentucky corporation with its principal office listed with the Kentucky Secretary of State as:  Office of University Counsel, University of Louisville, Louisville, Kentucky 40292.  At all times relevant to this Complaint, the University has been a

public institution of higher learning created under Kentucky law with the power to sue and be sued.

13.     Upon information and belief, and at all times relevant to this Complaint, Defendant Toni M. Ganzel, M.D. was Dean of the University's SOM.  Upon information and belief, Dr. Ganzel's current residential address is 2513 Poplar Crest Road, Louisville, Kentucky 40207.

14.     Upon information and belief, and at all times relevant to this Complaint, Ronald I. Paul, M.D. was the University's Vice Dean of Faculty Affairs.  Upon information and belief, Dr. Paul's current residential address is 6502 Mount Batten Court, Prospect, Kentucky 40059.

15.     Upon information and belief, and at all times relevant to this Complaint, Gregory C. Postel, M.D. was the University's interim Executive Vice President.  Upon information and belief, Dr. Postel's current residential address is 1912 Mockingbird Bluff Lane, Louisville, Kentucky 40207.

16.     The foregoing individual Defendants are/were employed by the University, and their actions described below were done under color of State law.

17.     The foregoing individual Defendants are named as Defendants in their individual and personal capacity.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 for the claims brought under the laws of the United States.  This Court has supplemental jurisdiction pursuant to 27 U.S.C. § 1367(a) over all other

claims as they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

19.     Venue in this Court is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in or around Jefferson County, Kentucky, which is located within the United States District Court for the Western District of Kentucky.

## STATEMENT OF FACTS

### A.     An Overview Of Dr. Kaplan's Career.

20.     Dr. Kaplan has had an illustrious career that has brought him both international and national recognition in his specialty of ophthalmology.

21.     Dr. Kaplan graduated in 1968 with his medical degree from the Weill Medical College of Cornell University.

22.     He completed his medical internship in 1969 at the Case Western University's Lakeside Hospital in Cleveland, Ohio.

23.     He completed the first year of a surgical residency in 1970 at the New York University Medical Center before entering the U.S. Air Force as a Captain in the Medical Corps.

24.     He completed his residency in ophthalmology from 1975-1978 at the University of Iowa Hospitals and Clinics.

25.     During the early years of his career, Dr. Kaplan completed two fellowships.  He completed his research fellowship in ocular immunology from 1972-1974 at the University of Texas-Southwestern Medical Center in Dallas after which he was appointed an Assistant Professor in the Department of Cell Biology from 1974-1975.  He completed a fellowship in

ophthalmology (retina-vitreous) from 1978-1979 at the Medical College of Wisconsin in Milwaukee.

26.     Dr. Kaplan was board certified in ophthalmology in 1979.

27.     Upon completion of his retina-vitreous fellowship, Dr. Kaplan was appointed an Associate Professor of Ophthalmology at Emory University, Atlanta, Georgia in 1979.  He was promoted to Professor and Director of Research from 1984-1988.  From 1988 to 2000, Dr. Kaplan was a Professor in the Department of Ophthalmology & Visual Sciences at Washington University, St. Louis, Missouri, and was Chair of that department from 1988-1998.

28.     On or about October 1, 2000, Dr. Kaplan arrived at the University to serve as a tenured Professor in and Chair of the Department.  He served continuously as the Department's Chair following that original appointment.

29.     During his 18 years of service to the University, Dr. Kaplan served as CEO and President of Eye Specialists of Louisville ("Eye Specialists") (2000-2014).  Eye Specialists is a private practice corporation of the Department's faculty that includes each of the subspecialties in the field of ophthalmology.  Eye Specialists has office locations in Louisville, western Kentucky and southern Indiana.

30.     Dr. Kaplan served in various administrative positions for ULP since its founding in 2011.  ULP is the multi-specialty University SOM faculty clinical practice.

**B.     Dr. Kaplan's Long-Term Successful Service As Chair Of The Department**.

31.     As Chair, Dr. Kaplan was obligated to fulfill a number of general and specific duties, all of which were designed to advance the business and professional standing of the Department, which in turn advanced the business and professional standing of the SOM and the University.  Dr. Kaplan's general Chair duties included, but were not limited to, the following:

1. Establish a vision for the department and effectively communicate how it contributes to the success of individuals, the school, institution, and community;
2. Ensure recruitment and retention of adequate faculty and staff to meet the clinical, educational and research needs of the department;
3. Sustain a culture of inquiry and value the scholarship of discovery, application, integration and teaching;
4. Support and encourage diversity amongst department's constituents creating an environment of professionalism, respect, tolerance and acceptance;
5. Support and provide guidance to faculty in their pursuits of excellence in clinical, teaching, research, and community engagement goals to be successful in achieving promotion and tenure;
6. Represent the department at Medical Council and effectively communicate its proceedings to the departmental faculty; and

Exhibit 1, March 12, 2018 letter.

32.     By any objective measure, Dr. Kaplan's stewardship of the Department during his

18 years as Chair was a resounding success, as evidenced by his most recent five-year Chair

review completed by the University.  Pursuant to the University Redbook § 3.3.5(D), a

department chair is reviewed every five years by the academic unit in which the department

resides.

33.     In 2018, Dr. Kaplan received the results of his five-year Chair review for the

period of 2012-2016.  The review committee's report (the "Report") was presented to Dean

Toni M. Ganzel ("Dean Ganzel") of the University's Medical School on or about January 30,

2018.  Exhibit 2, Report

34.     In short, and as described in detail by the Report, the Chair review was

overwhelmingly positive, and the review committee unanimously recommended that Dr. Kaplan

continue as Chair.  Exhibit 2, Report.

35.     On March 7, 2018, Dean Ganzel congratulated Dr. Kaplan on his

"accomplishments and the advancement of the department and its missions under [his] leadership

during the past five years."  Exhibit 3, March 7, 2018 letter.  Dean Ganzel informed Dr. Kaplan

that she endorsed the review committee's Chair reappointment recommendation.  *Id.*
Accordingly, Dr. Kaplan was reappointed the Department's Chair for another five-year term to
retroactively run from 2017-2022.  *Id.*  Dr. Kaplan's next scheduled five-year Chair review
would not be until calendar year 2022.  *Id.*

**C.    In 2018, Dr. Kaplan Addresses The Impact Of The University's Department
        Funding Cuts And Issues With Clinical Office Space For The Department.**

1.    <u>The Department Seeks Options For University Funding Shortfalls</u>.

36.    In May 2018, the University announced that it was instituting "cost controls"
through all of its departments due to budget shortfalls.  Specific to the Department, the
University informed it that all of its faculty clinicians were going to have their salaries cut by
fifteen percent (15%) for fiscal year 2019.

37.    As might be expected, Dr. Kaplan received numerous complaints from his faculty.
As Chair, Dr. Kaplan was very concerned that these funding cuts would result in a significant
loss of existing clinicians, especially those with no non-compete agreement with the University
who would leave the Department for better paying positions, and loss of future quality clinician
candidates, who would choose to work for other better paying universities.  Such an exodus
and/or such hiring difficulties would have a major impact on the Department's clinical practice,
research, and revenues.  The impact on the Department's revenues was particularly problematic
as historically the Department was one of the few profitable University departments, which
allowed it to provide net revenue to the University prior to the increased allocation of ULP
overhead in fiscal year 2014 and subsequent fiscal years.

38.    In considering potential sources of additional revenue for the Department (and
consequently the University), Dr. Kaplan began to brainstorm and research alternative financial

arrangements with several of the Department's clinicians in order to benefit both the Department and the University.

39.     One potential source of revenue known to be available in the medical field of ophthalmology is the purchase of the Department's clinical practice by a private equity group. Under such a scenario, the practice group is purchased by the outside investor and rolled into a larger, regional practice.  Using the efficiencies from that combination, the investment group continues to fund the Department at the pre-acquisition level, allowing the University to keep its pre-acquisition funding amount of the Department for other uses.

40.     Additionally, such an alternative financing arrangement would allow the University to allocate the salary compensation it previously paid its clinicians (which would now be paid by the investor going forward) for use by the Department to support the research mission of the University's SOM, including the Department's Kentucky Lions Eye Center.

41.     Dr. Kaplan and his clinicians were well-aware that no such financing agreement could be entered into without the University's inclusion and approval because all of the clinicians that joined the Department in 2014 and beyond had a non-compete agreement in their University contracts.

42.     Additionally, Dr. Kaplan and the Department's clinical faculty wanted to maintain a contractual relationship with the University in order to maintain the Department's residency program in Ophthalmology, fellowship programs in Retina, Uveitis and Oculoplastics, and 24/7 coverage of the Emergency Department at ULH.

43.     As Chair of the Department, Dr. Kaplan had detailed communications with four investment groups for information gathering purposes only, including one group which had recently acquired a similar ophthalmology group affiliated with the University of Cincinnati, and

another group that had recently acquired two Ophthalmology specialty practices in Louisville and western Kentucky.

44.     At no time did Dr. Kaplan or the Department enter into any written or verbal agreement with any investment group, nor did Dr. Kaplan's communications with investment groups result in a letter of intent.

2.     <u>At the Same Time, The Department Needed New Space In Which To Expand Its Clinical Practices.</u>

45.     In fiscal years 2017 and 2018, the Department maintained multiple medical offices operated under the name of University of Louisville Physicians-Eye Specialists to conduct its clinical services for its patients.  The Department's busiest private office was located in the Springs Medical Center ("SMC") located at 6400 Dutchmans Parkway in Louisville.

46.     In the latter part of 2017 and first half of 2018, while Dr. Kaplan was also serving as the Chair of the ULP's Finance Committee, he and his Department faculty recognized that the Department's SMC office needed more clinical space in the building as a result of:  (i) the increased patient volume of the office; (ii) the request by several clinical faculty for more office time at SMC; and (iii) the Department's financial need to relocate its pediatric care office from its then Brownsboro Road location.

47.     Dr. Kaplan inquired through interim CEO of ULP, Dr. Gerard Rabelais, whether there was any office space at SMC leased by ULP that was available immediately or anticipated to be available in the near future for use by the Department.  Dr. Kaplan was told that no such space could be identified.

48.     Coincidentally, the Department became aware of an office vacancy at SMC that it believed would accommodate all of its existing space needs.

49.     As Chair, Dr. Kaplan began working to secure a lease at SMC for the new space. From March to May 2018, Dr. Kaplan notified appropriate University administrators of the Department's need to secure a new SMC lease.

50.     In May 2018, the Department was notified by the SMC landlord that the targeted SMC space was going to be released to another tenant due to the fact that the Department had yet to agree to a new lease after 8 weeks of negotiation.  At the same time, the Department was informed that the Brownsboro Road location was being closed at the start of the summer.

51.     On May 21, 2018, Dr. Kaplan decided that it was in the best interest of the Department to enter the new SMC lease before losing out on the needed space and effectively abdicating its pediatric ophthalmology practice in East Louisville.  Accordingly, Dr. Kaplan, in his capacity as Chair, signed a new SMC lease.

52.     On May 31, 2018, Dr. Kaplan met with the University's Interim Executive Vice-President Greg Postel ("Dr. Postel") to update him on the Department's lease negotiations and execution.  After Dr. Kaplan explained to him the reasons necessary for the Department to have entered the new lease, Dr. Postel confirmed that as Chair, Dr. Kaplan had the authority to determine the geographic location of the clinical office space to be used to provide services to its patients.  Mr. Dan Durbin, CFO of the SOM at that time, was invited to sit on that meeting by Dr. Postel and was present at the time this statement was made by Dr. Postel.

53.     Moreover, a Chair's authority to determine the clinical office space to be used by his/her Department's physicians to provide patient services had been in existence since the founding of the ULP group in 2011, of which Dr. Kaplan was a founding member.

**D.     The University Begins Taking Adverse Actions Against Dr. Kaplan.**

54.     On October 16, 2018, Dr. Kaplan was ordered to meet with Dean Ganzel and

Dr. Postel.  At the outset of the meeting, Dr. Kaplan was informed by Dean Ganzel that a Special

Chair Review Committee would be formed to review several allegations relating to his role as

Chair of the Department and the University's concerns over the allegations:  "we discussed your

unauthorized execution of a lease on behalf of ULP, failure to honor your initial obligation of the

Department to occupy space and use equipment in the PMOB resulting in expense to re-stock

equipment, alleged attempt to seek a loan to fund operations outside of ULP's regular financing

that could compromise ULP's debt covenant agreement and the creation of an LLC, that if

intended to spin-off the clinical practice of the Department into an outside entity, would violate

the Practice Plan."  Exhibit 4, October 25, 2018 letter.

55.     Dean Ganzel fully acknowledged during the meeting that Dr. Kaplan had

previously provided sufficient explanations for entering the lease at SMC; that he received

permission directly from her to relinquish the space in the Brownsboro Road location; that he

denied all allegations of seeking a "loan" to finance departmental activities that would violate

any ULP or University contract or policy; and that he formed Louisville Eye Specialists, LLC on

August 15, 2018, as a private company in which he was the only founder/employee in order to

personally finance an international eye hospital in Suzhou, China in a Joint Venture Agreement

with two Chinese colleagues.  Dr. Kaplan denied any commitment to an investment group to

"spin off" the Department's clinical practice from the University.  *Id.*

56.     Nevertheless, despite Dr. Kaplan's long history of impeccable service to the

University, as evidenced by, among other things, the Report, Dean Ganzel informed Dr. Kaplan

that she would be commencing a special chair review under Redbook § 3.3.5(D) to investigate

13

the issues.  *Id.*  According to Dean Ganzel, once the special review was commenced, Dr. Kaplan was to be placed on administrative leave, with pay, from his Chair position.  *Id.*  Dr. Ganzel indicated that the special chair review would not impact or relate to, in any way, Dr. Kaplan's ongoing work as a physician/clinician, a researcher, or an educator.  *Id.*

57.    The special review committee was scheduled to meet with Dr. Kaplan on November 14, 2018, at 2:00 p.m.  The morning of the scheduled meeting Dr. Kaplan was informed by Dean Ganzel's office that the meeting was canceled, with no explanation as to why or when it would be rescheduled.

58.    Also on that day, Dr. Kaplan was told to meet with Dean Ganzel and Ron Paul, Vice-Dean for Faculty Affairs ("Dr. Paul") at 7:30 a.m. on November 15, 2018.

59.    During the November 15 meeting, Dr. Kaplan was informed for the first time of the following by Dean Ganzel and Dr. Paul:  (i) the special review had been terminated by Dean Ganzel and the University before its completion; (ii) the same allegations that were to be investigated by the special review committee were now being investigated by the University's Audit Services; (iii) Dr. Kaplan was being placed on immediate administrative leave with pay; and (iv) the results of the Audit Services investigation could result in disciplinary actions up to and including termination from the University despite his tenure status.  Exhibit 5, November 15, 2018 letter.

60.    Moreover, Dr. Kaplan was informed that the University forbade him from engaging in what it considered to be any University-related activity, whether that activity would be in his role as Chair, clinician, researcher, or faculty member.  *Id.*  This prohibition was indefinite.  *Id.*

61.     Furthermore, Dr. Kaplan was informed that he could have no contact with <u>any</u> University personnel <u>for any reason</u>, nor could he step foot on University property, which would include the Department's clinical offices.  <u>Exhibit 6</u>, November 16, 2018 email.

62.     Upon information and belief, Dr. Kaplan's faculty received written communication from the Dean's office stating that communication with Dr. Kaplan during his "leave" could be grounds for dismissal from the University.

63.     Also on November 15, the University's Vice-President for Audit Services, Rhonda L. Bishop, entered Dr. Kaplan's office, without notice and without his presence, and confiscated his desktop computer.  Dr. Kaplan was also informed that he would have to turn in his University laptop immediately.

**E.     Negative Ramifications Of The University's Actions Against Dr. Kaplan Began Immediately Upon His Forced Administrative Leave.**

64.     The adverse impacts from the University's actions described above on Dr. Kaplan's ongoing professional obligations were immediate.

1.     <u>Adverse Impact On Dr. Kaplan's Patient Care</u>.

65.     As a practicing clinician, Dr. Kaplan was regularly scheduled to see patients on Tuesday and Thursday afternoons from 1:00 p.m. to 5:00 p.m.  During this time, Dr. Kaplan normally saw 15 to 20 patients, including established and new patients.

66.     Dr. Kaplan's patients' appointments were usually made several months in advance.  Dr. Kaplan's patients choose to see him specifically due in large part to his nationally recognized preeminence in the field of Ophthalmology, including in the specialties of Uveitis and Retina.

67.     The University's absolute prohibition against Dr. Kaplan being on the University's clinical premises, including SMC, eliminated Dr. Kaplan's ability to treat any of his patients.  Because Dr. Kaplan was prohibited from communicating with other Department clinicians, he was not able to make arrangements to obtain coverage for his patient appointments. Moreover, Dr. Kaplan could not determine if anyone even saw his patients at their scheduled appointments or whether those appointments were canceled by the University.

68.     Dr. Kaplan's prohibition from treating his patients was an especially acute problem for those patients requiring immune suppression for treatment of intraocular inflammation (i.e. Uveitis).  Dr. Kaplan is a nationally recognized expert in this treatment, and if the treatment was interrupted or done improperly, his patients could suffer significant and severe adverse, permanent health effects including death since immune suppression inhibits the body's ability to combat infection.

69.     Dr. Kaplan's prohibition from treating his patients negatively impacted his professional standing and reputation.  In January 2019, Dr. Kaplan received notification that he was going to be delisted from BestDoctors.com, a national listing of medical experts in their field for use by persons seeking medical information in making medical care decisions.  Listing is only available for a doctor who is clinically active.  While Dr. Kaplan was prohibited from seeing patients, he was not considered clinically active, and was therefore ineligible for the subject listing.

2.     <u>Adverse Impact On Dr. Kaplan's Ongoing Research</u>.

70.     Due to the University's prohibitions described above, Dr. Kaplan's ongoing research activities were effectively halted.

16

71.     Prior to the enforced administrative leave and prohibitions from communications with University collaborators, Dr. Kaplan had been working on multiple research presentation proposals for submission by November 30, 2018.  That was the deadline for proposal submissions to the 2019 meeting of the Association for Research in Vision and Ophthalmology ("ARVO"), which is the world's largest and most respected eye and vision research organization. ARVO's annual conference was scheduled to begin April 28, 2019.  Dr. Kaplan was a regular presentation participant annually at the AVRO conference.  The University's actions interfered with his continued work on those submissions.

72.     Prior to the enforced administrative leave and prohibitions from communications with University collaborators, Dr. Kaplan was working on two important research funding grant proposals - one was due on December 4, 2018; the other on March 5, 2019 - both of which required his active, ongoing contributions to complete.  Such grants take months to write and revise and Dr. Kaplan's administrative leave impacted both proposals as his work on them was halted.

73.     Prior to the enforced administrative leave and prohibitions from communications with University collaborators, at least on a weekly basis if not more frequent, Dr. Kaplan had to collaborate with many different colleagues domestically (including research collaborators at the University) concerning the design and continued conduct of his multiple, ongoing research projects.  The University's confiscation of his computers, as well as administrative leave and restrictions eliminated Dr. Kaplan's ability to continue with his collaborative research efforts.

74.     Additionally, Dr. Kaplan's then-current, awarded grant projects were interfered with by Defendants.

75.     Since the late 1990s, Dr. Kaplan has been a collaborator on a project involving the development and implantation of a bionic eye.  In May 2018, Dr. Kaplan was awarded a grant from Bionic Eye Technology ("BET"), as the Principal Investigator, providing funds for the development of pre-clinical data for FDA submission of a clinical trial.  Exhibit 7, June 1, 2018 email and attachments.

76.     On December 8, Dr. Kaplan was informed by his long-standing colleague and collaborator at another university on the bionic eye project of the following:  (i) earlier in the week, Dr. Kaplan's colleague received an email appointment for a telephone conference call on Friday, December 7; (ii) the colleague initially thought the message was from Dr. Kaplan, but when he joined the call he learned that it was scheduled by the acting Department Chair Dr. Jöern Soltau ("Dr. Soltau") and Dr. Maureen McCall ("Dr. McCall"), a professor in the Department, neither of whom had any previous involvement in the bionic eye project or the grant; and (iii) Dr. McCall stated that the purpose of the call was to inform Dr. Kaplan's colleague that she had the authority to remove Dr. Kaplan as the Principal Investigator on the grant if he so desired.

77.     The actions taken by Dr. Soltau and Dr. McCall while Dr. Kaplan was on administrative leave and prohibited from communicating with University colleagues, certainly at the Defendants' direction and with their blessing, were taken without Dr. Kaplan's knowledge or consent.

78.     Moreover, on information and belief, the University, through its agents, employees, and representatives, have informed faculty with whom Dr. Kaplan collaborated not to include his name on any manuscripts or grants that were to be submitted.  This instruction had

been given, and was to be followed, regardless of whether Dr. Kaplan was a Principal

Investigator on a subject grant and regardless of Dr. Kaplan's contributions to the work.

79.     Furthermore, in relation to Dr. Kaplan's then-existing grant work, there were

several federal research documents that required annual renewal, and his collaborators had been

informed by the University, through its agents, employees, and representatives, to renew the

documents without Dr. Kaplan's name being attached to them even though he was required to

complete them as the grants' Principal Investigator.  Specifically, Dr. Kaplan was Principal

Investigator on a major grant from the National Institute of Health ("NIH") on retinal

transplantation, work that he had been pursuing with continuous NIH funding since 1972.  The

University's actions abrogated his ability to participate in this grant, and subsequently the

University had NIH remove him from the grant.

80.     Additionally, Dr. Kaplan's then-current publishing contract was interfered with

by Defendants.

81.     Dr. Kaplan and one of his Department colleagues were under contract to write a

book relating to their ophthalmology specialty, Uveitis.  On December 18, 2018, Dr. Kaplan's

colleague was told by the University's Audit Services that he was not allowed to communicate

with Dr. Kaplan for any reason until after the University's "investigation" of Dr. Kaplan was

complete.

82.     The University's interference adversely impacted the ability of Dr. Kaplan and his

colleague to meet contract deadlines, such as submitting a finalized chapter author list for the

book, given their inability to collaborate on their work for the book.  Dr. Kaplan and his

colleague missed the publisher's extended deadline (January 15) for submitting their list of

chapter authors as a result of the continued prohibition of communications with Dr. Kaplan.

3.     Adverse Impact On Dr. Kaplan's Chair Obligations And Reputation.

83.     On November 17, 2018, Dr. Kaplan had been scheduled to participate in the Department's medical resident applicant interviews.  Dr. Kaplan was required to participate in those interviews as Chair as part of his ongoing duty to, among other things, "ensure recruitment and retention of adequate faculty and staff to meet the clinical, educational, and research needs of the department."  Exhibit 1, March 12, 2018 letter.

84.     During the November 15 meeting described above, Dr. Kaplan specifically requested that his administrative leave be deferred to begin on November 18, the day after the last scheduled resident interviews, so that he would be present for the November 17 interviews just as he had been present for the previous two interview days – Saturday, November 10 and Sunday, November 11.  Dr. Kaplan's concern was that his absence would reflect negatively on the resident candidates' assessment of the Department and Dr. Kaplan's leadership of it.

85.     The University denied Dr. Kaplan's request despite the obvious potential adverse impact it would have on the Department's resident recruitment and Dr. Kaplan personally.

86.     The University compounded the negative impact, especially as to Dr. Kaplan's leadership and reputation, when one or more of its agents, employees, and representatives, upon information and belief, informed resident candidates that Dr. Kaplan was on administrative leave.

87.     The University compounded the negative impact on Dr. Kaplan's professional standing, character, reputation, and integrity by directly informing the American University Professors of Ophthalmology ("AUPO") that Dr. Kaplan was no longer Department Chair before the completion of the Audit Services investigation and his actual removal as the Chair.  As a

result of that University communication, Dr. Kaplan was no longer eligible for membership in that organization.  Exhibit 8, December 5, 2018 email.

88.     The University, through its agents, employees, and representatives, further compounded the negative impact on Dr. Kaplan's professional standing, character, reputation, and integrity by contacting the National Eye Institute[1] to inform it that he was "under investigation," without any clarification that the investigation had nothing to do with scientific research.

89.     The University, through its agents, employees, and representatives, further compounded the negative impact on Dr. Kaplan's professional standing, character, reputation, and integrity by representing to groups outside the University and Department, such as the Louisville Lions Club, that he had been replaced as Department Chair by Dr. Soltau.

     4.     Conclusion.

90.     The Defendants' above-described actions against Dr. Kaplan improperly compromised Dr. Kaplan's ability to carry out his duties as Chair, as a clinician, as a researcher, and as a member of the Department faculty.  *See, e.g.*, Exhibit 1, March 12, 2018 letter.

91.     The Defendants' above-described actions against Dr. Kaplan were illegal and arbitrary in violation of University policies including, but not limited to, the Redbook.[2]

92.     The Defendants' above-described actions against Dr. Kaplan violated applicable federal and state law.

---

[1]The National Eye Institute is one of the institutes and centers that comprise the U.S. National Institutes of Health, an agency of the federal Department of Health and Human Services.

[2]The current version of the University Redbook, incorporated herein by reference, is publicly available at the following web address: http://louisville.edu/provost/redbook.

93.     As a result of the Defendants' above-described actions against Dr. Kaplan, he suffered harm, and continues to suffer harm, to protected rights and status, and to his reputation, good name, honor, integrity, and professional standing.

**F.     After Completion Of The Audit Services Report, Dr. Kaplan Was Removed As Chair And The University Is Terminating Him.**

94.     On January 23, 2019, while the Audit Services "investigation" was still in progress, Dr. Kaplan received a letter from Dean Ganzel in which she provided a handful of discrete exemptions to the absolute prohibitions against him having any communications with his University colleagues only in order to "secur[ing] due acknowledgement" on current research projects.  Exhibit 9, January 23, 2019 letter.  However, Dean Ganzel clearly reiterated that if Dr. Kaplan's communications with his colleagues exceeded the discrete, allowable parameters ("you are directed to restrict these communications to these purposes only and to not engage in any other work-related discussions."), he would face disciplinary action "up to and including termination."

95.     On February 12, 2019, Audit Services informed Dr. Kaplan that it had "completed the review of report events for which [Dr. Kaplan was] involved in the Department."  Exhibit 10, February 12, 2019 email.  Dr. Kaplan was also informed that Audit Services had scheduled an interview with him on Thursday, February 28.  *Id.*  Dr. Kaplan attended the scheduled Audit Services interview.

96.     On April 19, 2019, Audit Services issued its investigation report.  Exhibit 11, Audit Services Report.  The scope of the investigation and its details are described in the attached Report.

97.     The Audit Services investigation was simply the University's attempt to paper a "justification" for terminating Dr. Kaplan, a long-term, faithful servant to the University.  In response to the only reason that Dr. Kaplan was informed on November 15, 2018, for the "investigation" (his exploration of alternative funding for the Department's clinical program), Dr. Kaplan denied any wrongdoing at the November 15, 2018 Dean Ganzel meeting and at the February 28, 2019 Audit Services meeting.

98.     More specifically, Dr. Kaplan's contact with venture capital firms to research alternative funding options did not violate the University practice plan, did not commit the Department to separate from the University (i.e. it executed no agreement with a venture capital firm), and did not provide any HIPAA protected information to any venture capital firm.

99.     Knowing that investigation of Dr. Kaplan's exploration of alternative funding for the Department's clinical program would not alone provide a valid basis to terminate him from the University, the Audit Services Report included other alleged misconduct by Dr. Kaplan.

100.    The Audit Services Report accused Dr. Kaplan of HIPAA violations.  *Id.*

101.    On May 8, 2019, Dr. Kaplan was contacted by the University's outside HIPAA counsel as part of the Audit Services' review of alleged HIPAA violations by Dr. Kaplan that were referenced in the Audit Services report.  Dr. Kaplan was told that the investigation was necessary for the University's determination if it had to self-report itself and Dr. Kaplan for HIPAA violations.  HIPAA counsel provided a questionnaire for Dr. Kaplan to complete regarding his alleged improper electronic storage and use of Department patient health information.  Dr. Kaplan's responses were provided to HIPAA counsel on May 21, 2019. Exhibit 12, HIPPA Questionnaire Responses.  Afterwards, no further communication was received from HIPAA counsel regarding its investigation, and no notice was provided that the

University self-reported a HIPAA violation.  Accordingly, it is clear that Dr. Kaplan did not violate HIPAA.

102.    The Audit Services Report also accused Dr. Kaplan of violating the University's conflict of interest disclosure policy.  *Id.*  Specifically, the Report alleged that Dr. Kaplan did not disclose his ownership interest in four LLCs that would result in a financial conflict of interest with the University.  However, none of the entities identified in the Report were established to compete with the University, none of them were established for purposes of securing splitting the Department from the University if alternative financing was secured, and/or none had provided Dr. Kaplan financial compensation. Dr. Kaplan had no actionable conflict of interest.

103.    The Audit Services Report also accused Dr. Kaplan of improperly treating Department faculty and staff.  *Id.*  This issue was previously investigated as part of Dr. Kaplan's five-year Chair review completed in Spring 2018, and it was determined that "Dr. Kaplan's leadership and management of the department are praised uniformly and the departmental staff or leadership issues did not come up."  Exhibit 2, Report, Section 5(D)(b)(b).  In fact, Dr. Kaplan's five-year Chair review, completed in January 2018 without the goal of terminating Dr. Kaplan from the University, stated that his communication and leadership was "universally praised" as follows (*Id.*, Section 5(D)(a)):

**D. Department Administration and Finance:**
a. Strengths:
    a.    Dr Kaplan's communication, leadership, departmental management, and faculty development skills are universally praised and admired in his department. He is seen as approachable and supportive, and none of the issues raised in previous reviews were present in the data or interviews reviewed by the committee.
    b.    The commitment to recruiting and retaining minority and women faculty noted in previous reviews continues to be a strong factor for the department under Dr Kaplan's leadership.

104.    Related to this issue, toward the conclusion of Dr. Kaplan's interview with the five-year Chair review committee, which took place near the conclusion of its 2018 review of him, Dr. Kaplan was asked by one of the committee members what he had done that made his faculty happy and supportive as compared to other SOM faculty.  Furthermore, when Dean Ganzel met with his faculty to report the results of Dr. Kaplan's five-year Chair review, she commented that it was one of the most outstanding recommendations of a Chair during her tenure.  Dr. Kaplan had no issues with improperly treating faculty and staff.

105.    Finally, the Audit Services report also accused Dr. Kaplan of insubordination in relation to his financial management of the Department.  Exhibit 11, Audit Services Report.  To the contrary, the now-challenged decisions Dr. Kaplan made regarding Department finances and leases were all done with only the good of the Department in mind, and with the knowledge of the Department.

106.    The Audit Services Report recommended that the following actions be taken against Dr. Kaplan:  "we recommend administration take appropriate disciplinary action, up to and including termination of Dr. Kaplan's position as Chair of the [Department] and revocation of tenure at the University of Louisville."  Exhibit 11, Audit Services Report, p. 1.

107.    Interestingly, after Audit Services' recommendation against Dr. Kaplan, the University announced that it had reached an alternative financing arrangement with Norton Healthcare to "transition management of [ULP] pediatrics' clinical activities to Norton.  The transaction will provide much-needed funding to support the academic and research mission in the School of Medicine. ... pediatric service line faculty and staff will transition to Norton ..." Exhibit 13, June 20, 2019 email.  This type of arrangement is exactly what Dr. Kaplan had been

exploring for his Department, but for which he was suspended, investigated, and is now being terminated.

108.    On August 1, 2019, Dr. Kaplan was informed that Dean Ganzel was seeking to terminate him from the University based upon the "conduct" investigated by Audit Services. Exhibit 14, August 1, 2019 letter ("This letter serves as the notice of my written recommendation of dismissal of your appointment as Professor (Tenured) in the School of Medicine, Department of Ophthalmology and Visual Sciences . . . I am providing notice of my recommendation of dismissal, with a separate letter simultaneously sent to the President").

109.    Also on August 1, 2019, to add further insult to injury and clearly in coordination with Dean Ganzel's August 1 letter, Dr. Paul emailed Dr. Kaplan to inform him that the previously terminated special chair review committee was being resurrected based upon the Audit Services Report.  Exhibit 15, August 1, 2019 email.

110.    Dr. Kaplan responded by stating, among other things, the following:  (i) that the October 2018 special chair review had been "ceased" by Dean Ganzel; (ii) Dr. Kaplan had been provided no notice prior to Dr. Paul's email that another special chair review had begun; and (iii) Dean Ganzel's attempt to remove Dr. Kaplan from the University is consistent with Dr. Kaplan's understanding that the October 2018 special chair review had been terminated.  Exhibit 16, August 19, 2019 letter.

111.    In response on August 23, 2019, Dr. Paul ignored the fact that Dean Ganzel had terminated the October 2018 special chair review.  Instead, he claimed that the special chair review "is a continuation of the Special Chair Review commenced in October 2018." Exhibit 17, August 23, 2019 letter.

112.    On August 30, 2019, Dr. Kaplan responded to the "continued" chair review.

Exhibit 18, August 30, 2019 letter.  He emphatically denied the allegations in the Audit Services

Report.  *Id.*  Moreover, Dr. Kaplan recognized the sham that was the "new" review of his

Chairmanship of the Department following the Audit Services Report (*Id.*, p. 1) (Bold added):

> Respectfully, the Dean's November 15 letter does not support that
> position.  The Dean was clear – the Review "has ceased and any
> investigation into the allegation brought to the attention of University
> officials will continue to be investigated by Compliance and Audit
> Services." (Emphasis added).  **In other words, the Review was not
> postponed; it was over.  There is no mention of the Review anywhere
> else in the Dean's letter, much less an explanation that the Review
> could be "continued" to consider the outcome of the result of Audit
> Services' investigation**.

> That issue aside, if the Review is back from hiatus to go forward against
> Dr. Kaplan, **it is unimaginable that it will not simply fall in line with
> the Dean's August 1 letter**.  The Dean presented a statement of charges
> against Dr. Kaplan, based on the purported results of the April 19 Audit
> Services report (the "Report"), with a written recommendation of his
> termination from the University.  **We do not believe there is a scenario
> in which the "independent" Review produces a result inconsistent
> with the Dean's termination recommendation, i.e. the Dean wants to
> terminate Dr. Kaplan, but the Review recommends that Dr. Kaplan
> remains Chair of the Department of Ophthalmology and Visual
> Sciences (the "Department").  We have had too much experience with
> the inner workings of the University and the School of Medicine to
> believe otherwise**.

113.    On September 9, 2019, as fully expected, Dr. Paul sent a letter to Dean Ganzel

stating that the special chair review recommended Dr. Kaplan be removed as Department Chair.

Exhibit 19, September 9, 2019 letter.  Dr. Paul's letter also recommended Dr. Kaplan's removal

from his endowed position with the University.  *Id.*  Such a recommendation intentionally

conflated Dr. Kaplan's Chair position with his endowed position.  The "new" arbitrary special

chair review and its arbitrary recommendations violated the University's Redbook, § 3.3.5(D)(3).

114.    On September 13, 2019, the University rubber-stamped the sham special chair review and its recommendations.  Exhibit 20, September 13, 2019 letter.

115.    As a result of the Defendants' above-described actions against Dr. Kaplan, he suffered harm, and continues to suffer harm, to protected rights and status, and to his reputation, good name, honor, integrity, and professional standing.

## COUNT I
### VIOLATION OF PLAINTIFF'S FEDERAL PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS
### (42 U.S.C. § 1983; 42 U.S.C. § 1988; Fourteenth Amendment to the U.S. Constitution)

116.    Dr. Kaplan has a constitutionally protected property interest in his Chair position.

117.    Dr. Kaplan has a constitutionally protected property interest in his positions as a clinician, researcher, and/or tenured faculty member.

118.    Dr. Kaplan has a constitutionally protected liberty interest in pursuing his chosen medical profession (including treating patients and conducting medical research), in his professional livelihood, and in his reputation, good name, honor, integrity, character, and professional standing.

119.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants' actions violated Dr. Kaplan's right(s) not to be deprived of his property and/or liberty interests without due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

120.    As set forth more fully above in ¶¶ 7-9, 54-63, and 64-93, Defendants' actions described above violated Dr. Kaplan's academic freedom and speech.

121.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants'
actions described above were taken without cause and/or for reasons that were arbitrary and
capricious.

122.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, in
implementing, ratifying and/or affirming the actions by its agents, representatives, and
employees, Defendant University acted in an arbitrary and capricious manner.

123.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants'
actions violated Plaintiff's due process right(s) to be free from arbitrary and capricious
deprivations of property under the Fourteenth Amendment of the United States Constitution.

124.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, the
constitutional violations against Dr. Kaplan are of an ongoing and continuous nature.

125.    In taking the actions against Dr. Kaplan set forth more fully above in ¶¶ 7-9, 54-
63, 64-93, and 94-115, Defendants acted intentionally, maliciously, and unlawfully without
providing Dr. Kaplan procedural and substantive due process in violation of governing law.

126.    As a result of the Defendants' wrongful actions, Plaintiff has suffered
compensatory damages to be proven at trial.

## COUNT II
## VIOLATION OF PLAINTIFF'S STATE PROCEDURAL AND
## SUBSTANTIVE DUE PROCESS RIGHTS
## (Kentucky Constitution, Sections 1 and 2)

127.    Dr. Kaplan has a constitutionally protected property interest in his Chair position.

128.    Dr. Kaplan has a constitutionally protected property interest in his positions as a
clinician, researcher, and/or tenured faculty member.

129.    Dr. Kaplan has a constitutionally protected liberty interest in pursuing his chosen medical profession (including treating patients and conducting medical research), in his professional livelihood, and in his reputation, good name, honor, integrity, character, and professional standing.

130.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants' actions violated Dr. Kaplan's right(s) not to be deprived of his property and/or liberty interests without due process of law as guaranteed by Sections 1 and 2 of the Kentucky Constitution.

131.    As set forth more fully above in ¶¶ 7-9, 54-63, and 64-93, Defendants' actions violated Dr. Kaplan's academic freedom and speech.

132.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants' actions were taken without cause and/or for reasons that were arbitrary and capricious.

133.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, in implementing, ratifying and/or affirming the actions by its agents, employees, and representatives, Defendant University acted in an arbitrary and capricious manner.

134.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants' actions violated Plaintiff's due process right(s) to be free from arbitrary and capricious deprivations of property under the Sections 1 and 2 of the Kentucky Constitution.

135.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, the constitutional violations against Dr. Kaplan are of an ongoing and continuous nature.

136.    In taking the actions against Dr. Kaplan set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants acted intentionally, maliciously, and unlawfully without providing Dr. Kaplan procedural and substantive due process in violation of governing law.

137.    As a result of the Defendants' wrongful actions, Plaintiff has suffered compensatory damages to be proven at trial.

## COUNT III
## DECLARATORY JUDGMENT
## (28 U.S.C. §§ 2201-2202)

138.    28 U.S.C. §§ 2201-2202 authorizes the Court to make a binding declaration of rights, whether or not further relief is or could be sought.

139.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, an actual, justiciable, and present controversy exists between Dr. Kaplan and Defendants, which requires an Order declaring the rights and duties of the parties including, but not limited to, a declaration that:  (i) Dr. Kaplan has one or more legally protected property interests or rights; (ii) Dr. Kaplan has one or more legally protected liberty interests or rights; (iii) one or more of the Defendants' actions against Dr. Kaplan violated his federally protected interests or rights; and (iv) as a result of Defendants' illegal actions, one or more of Dr. Kaplan's federally rights protected interests or rights were harmed.

## COUNT IV
## DECLARATORY JUDGMENT
## (KRS 418.040)

140.    KRS 418.040 authorizes the Court to make a binding declaration of rights, whether or not further relief is or could be sought.

141.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, an actual, justiciable, and present controversy exists between Dr. Kaplan and Defendant, which requires an Order declaring the rights and duties of the parties including, but not limited to, a declaration that:  (i) Dr. Kaplan has one or more legally protected property interests or rights; (ii) Dr. Kaplan

has one or more legally protected liberty interests or rights; (iii) one or more of the Defendants' actions against Dr. Kaplan violated his federally protected interests or rights; and (iv) as a result of Defendants' illegal actions, one or more of Dr. Kaplan's federally rights protected interests or rights were harmed.

### COUNT V
### INJUNCTIVE RELIEF
### (Federal and State law)

142.    As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, due to the Defendants' actions, Dr. Kaplan has suffered immediate and irreparable injury and will continue to so suffer in violation of his rights unless Defendants are enjoined from such activity by Order of this Court.

143.    Dr. Kaplan has no adequate remedy at law or otherwise to address his non-monetary injuries, save in a court of equity.

144.    The public interest would be best served by ensuring that Defendants are enjoined from ongoing and future illegal actions against Dr. Kaplan.

145.    No previous application by Dr. Kaplan against the Defendants for a Restraining Order or an Injunction has been refused by any court.

### COUNT VI
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND
### EXPECTANCIES
### (State law)

146.    Dr. Kaplan has a valid business relationship and expectancy with his patients.

147.    Dr. Kaplan has/had a valid business relationship and expectancy with his ongoing and future research projects, grants, and collaborator relationships.

148.     Defendants are/were well-aware of Dr. Kaplan's treatment of patients through the Department's clinics and ULP.

149.     Defendants are/were well-aware of Dr. Kaplan's ongoing and future research projects and grant funding.

150.     As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants have intentionally interfered with Dr. Kaplan's patient treatment.

151.     As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants have intentionally interfered with Dr. Kaplan's ongoing and future research projects and grant funding.

152.     As set forth more fully above in ¶¶ 7-9, 54-63, 64-93, and 94-115, Defendants have intentionally interfered with Dr. Kaplan's book contract.

153.     Defendants have no valid justification for interfering with Dr. Kaplan's treatment of patients and the motives behind their interference are improper.

154.     Defendants have no valid justification for interfering with Dr. Kaplan's ongoing and future research projects and grant funding and the motives behind their interference are improper.

155.     Defendants have no valid justification for interfering with Dr. Kaplan's ongoing book contract and the motives behind their interference are improper.

156.     Defendants' intentional and malicious interference with Dr. Kaplan's patient treatment has caused him to suffer damages.

157.     Defendants' intentional and malicious interference with Dr. Kaplan's ongoing and future research projects and grant funding has caused him to suffer damages.

158.    As a result of the Defendants' wrongful, tortious, and malicious actions, Plaintiff has suffered special damages to be proven at trial.

159.    As a result of the Defendants' wrongful, tortious, and malicious actions, Plaintiff is entitled to an award of punitive damages in amount to be proven at trial.

WHEREFORE, Plaintiff Henry J. Kaplan, M.D. respectfully requests:

A.    Judgment against Defendants for all compensatory damages suffered by Plaintiff in an amount to be determined at trial;

B.    Judgment against Defendants for all special damages suffered by Plaintiff in an amount to be determined at trial;

C.    Judgment against Defendants for punitive damages in an amount to be determined at trial;

D.    Judgment against the Defendants for Plaintiff's costs and expenses incurred in bringing this action, including all reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

E.    A declaration of the rights and duties of the parties including, but not limited to, a declaration that:  (1) Dr. Kaplan has one or more legally protected property interests or rights; (2) Dr. Kaplan has one or more legally protected liberty interests or rights; (3) one or more of the Defendants' actions against Dr. Kaplan violated his federally protected interests or rights; and (4) as a result of Defendants' illegal actions, one or more of Dr. Kaplan's federally rights protected interests or rights were harmed.

F.    A Judgement against Defendants enjoining them, and all of those persons and entities acting in concert with them, from taking any actions violating Dr. Kaplan's protected interests and rights;

G.      For trial by jury on all of Plaintiff's claims; and

H.      All other relief to which Plaintiff may be entitled.

Respectfully submitted,

*/s/ Kevin L. Chlarson*
Dennis D. Murrell
Kevin L. Chlarson
Katherine T. Reisz
MIDDLETON REUTLINGER
401 South Fourth Street, Suite 2600
Louisville, Kentucky 40202
(502) 584-1135
(502) 561-0442 (Fax)
dmurrell@middletonlaw.com
kchlarson@middletonlaw.com
kreisz@middletonlaw.com
*Counsel for Plaintiff*