**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00825-CRS
SENIOR JUDGE CHARLES R. SIMPSON, III**

**HENRY J. KAPLAN, M.D.**                                            **PLAINTIFF**

**v.**                                            *ELECTRONICALLY FILED*

**UNIVERSITY OF LOUISVILLE, et al.**                                            **DEFENDANTS**

**PLAINTIFF'S RESPONSE OPPOSING DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff Henry J. Kaplan, M.D. ("Dr. Kaplan" or "Plaintiff"), by counsel, respectfully submits his Response to the Motion to Dismiss (the "Motion") his Amended Complaint filed by University of Louisville ("University"), Toni M. Ganzel ("Ganzel"), Ronald I. Paul ("Paul") and Gregory C. Postel ("Postel") (the "Defendants").

## INTRODUCTION

Between Defendants' first Motion to Dismiss (DN 6) and the Amended Complaint (DN 15) ("Complaint" or "Compl."), Dr. Kaplan was terminated from his tenured professorship in the Department of Ophthalmology and Visual Sciences ("Department" or "DOVS").   Compl., ¶¶ 138-141; Ex. 30.[1]   The termination rubber-stamped the end of Dr. Kaplan's 18 years of distinguished service to the University that occurred on November 15, 2018, when he was informed that he was persona non grata ("PNG") at the University indefinitely.   Compl., ¶¶ 62-65.   Upon his PNG status, Dr. Kaplan was immediately relieved of all duties as a tenured clinician, researcher, and faculty member; he was prohibited from setting foot on any University property; he was prohibited from communicating with or being contacted by any University

---

[1]Numbered exhibit references are to exhibits filed with the Amended Complaint.

personnel; and he was removed as DOVS Chair.  *Id.*; Ex. 5 and 6.  These adverse actions were before any "investigation of concerns" was initiated, and before Dr. Kaplan had notice and an opportunity to respond to the "concerns."  Compl., ¶¶ 66-67.

As described in the Complaint and below, as a direct consequence of Defendants' illegal actions, Dr. Kaplan was deprived of federal and state protected procedural and substantive due process rights.  Defendants also tortiously interfered with Dr. Kaplan's ongoing and future scholarship and research, and his physician-patient relationships.  Dr. Kaplan, a 77 year old physician and professor illegally terminated from his tenured position, has been harmed by Defendants' actions, entitling him to damages as well as declaratory and injunctive relief.

Defendants portray Dr. Kaplan as a rogue faculty member taking "unauthorized and fraudulent measures" to sell DOVS to private investors. That did not happen (*Id.*, ¶¶ 43-47), but if Dr. Kaplan was a "fraud," and given Defendants' actions to sever all University ties to Dr. Kaplan (*Id.*, ¶¶ 57-141), it is ironic the University represents to the outside world that Dr. Kaplan is still a clinician and researcher in DOVS. Ex. A, June 7, 2020 DOVS faculty listings.

Under FRCP 12(b)(6), accepting all of Dr. Kaplan's well-pled allegations as true, he has more than adequately pled claims that "plausibly give rise to [his] entitlement to relief" from the Court.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Accordingly, Defendants' Motion should be dismissed, and they should be ordered to file their answer(s) to the Complaint.

## STATEMENT OF FACTS[2]

Before November 15, 2018, Dr. Kaplan had 40 years' experience as a physician, researcher, and academic, the last 18 of which were spent at the University as the tenured Evans Professor of Ophthalmology and DOVS Chair in the School of Medicine ("SOM").  Compl.,

---

[2]Dr. Kaplan restates all of the fact allegations pled in his Amended Complaint by reference herein.

¶¶ 21-31.   Dr. Kaplan faithfully served as a tenured clinician, researcher, teacher, and DOVS Chair.   *Id.*, ¶¶ 28-29.   His tenure and DOVS stewardship were resounding successes (*Id.*, ¶¶ 32-36; Exs. 1-3).   Dr. Kaplan's qualifications and reputation as a world-renowned Ophthalmologist are undisputed.   Ex. 2, Section 5(A).   His recent five-year Chair review in 2018 highlighted his significant contributions to DOVS, the University, and the Ophthalmology field:

> ***Over the last five years, Dr. Henry Kaplan's performance as Chair of [DOVS] has been superb***. Under his leadership, the DOVS has grown and clinic services have expanded. Research productivity is robust. An external peer review describes Dr. Kaplan as "one of the strongest clinician scientists in academic medicine right now" and goes on to detail some of his scientific accomplishments to the field. Dr. Kaplan is recognized as a generous and effective research mentor and this is reflected in the DOVS's rank in NIH funding. Faculty and trainees agree that Dr. Kaplan takes personal interest and helps them with their academic achievements including direct mentorship of projects. ***Anonymous reviews completed by faculty, students, alumni and staff were nearly universally positive***. It is clear that Dr. Kaplan is both admired and respected by those in his department. He is perceived as a strong leader, engaging and approachable and is considered as great role model to many faculty members in the DOVS. ***Faculty interviews suggest that morale is strong, a remarkable achievement given the current climate at the University***.

Ex. 2, p. 3 (emphasis added).   On March 7, 2018, the unanimous recommendation that Dr. Kaplan continue as Chair for another five-year term (2017-2021) was wholeheartedly accepted by Ganzel. Compl., ¶¶ 32-36, and Exs. 2 and 3.

1.   In Spring 2018, DOVS Faced A University-Induced Financing Crisis.

Historically, DOVS was one of the few University departments with profitable revenues. Ex. 2, Section 5(C)(e).   In May 2018, DOVS was informed that all of its faculty clinicians were subject to 15% salary cuts due to University budget shortfalls.   Compl., ¶ 37.   Affected DOVS faculty complained, and it was expected that there would be an exodus of clinicians leaving for better paying positions along with a loss of quality clinician candidates.   *Id.*, ¶ 38.   This would have a major negative impact on DOVS's clinical practice, research, and revenues.   *Id.*

DOVS's clinicians agreed to consider, and directed Dr. Kaplan to explore, potential

alternative financing options to benefit DOVS, the SOM, and the University.[3]  *Id.,* ¶ 40.   One alternative funding source is the purchase of DOVS's clinical practice by a private equity. Compl., ¶ 41.   The practice is purchased by the investor, rolled into a larger regional practice, and funded at the pre-acquisition level.   *Id.*   The University keeps pre-acquisition funding for other uses, such as reallocating faculty salaries to support SOM's broader research mission.   *Id.,* ¶¶ 41-42.   Dr. Kaplan gathered information only from four potential investors, including one that had recently acquired an ophthalmology group from the University of Cincinnati.   *Id.,* ¶ 45. DOVS knew that no agreement could be entered into without the University's inclusion and approval. *Id.,* ¶ 43.   DOVS's clinical faculty wanted to maintain a contractual relationship with the University to maintain its residency program, fellowship programs, and 24/7 coverage of the University of Louisville Hospital's ER.   *Id.*

Neither Dr. Kaplan personally nor DOVS entered into any letter of intent or purchase agreement with any investment group.   *Id.,* ¶ 46.   The University's Audit Services ("Audit") investigation discussed below found no executed letters of intent or purchase agreements because no such documents were executed.   *See* attachments to Ex. 11;[4] Ex. 21, pp. 2-3 (". . . the only plan of action was *to look into our options, i.e. a fact-finding exercise*. Nothing more.").

### 2.   Dr. Kaplan Was Informed Of "Concerns" Only With His Chair Performance.

On October 16, 2018, Dr. Kaplan was ordered to meet with Ganzel and Postel.   Compl., ¶ 57.   Dr. Kaplan was told that four "concerns" about him "as Chair" had been anonymously reported:   execution of a lease for additional clinical office space for DOVS's busiest location,

---

[3] While persecuting Dr. Kaplan, the University sold its entire Pediatrics Department to Norton.   Ex. 13.

[4] Audit argued that Dr. Kaplan "took steps" to sell DOVS.   Ex. 11, pp. 2-3.   Its sum "proof," after six months of unfettered forensic access to Dr. Kaplan's computers, were: three non-disclosure agreements (required for any financing opportunity information exchange); one email; a draft presentation from a prospective listing company; and an unsigned listing agreement ("[a] fully executed copy of the agreement could not be located . . ..").   *Id.*, p. 3 and its exhibits.   No letters of intent or purchase agreements, drafts or otherwise, were found; there were none.   *Id.*

for which he had been provided prior authority by Postel in May 2018 (Compl., ¶¶ 48-56); DOVS's decision to not relocate its pediatric practice to the new Novak Pediatric Office Building (Ex. 4, p. ) (copying Postel), even though it had not signed an agreement to do so;[5] contact with venture capital firms; and creation of an LLC solely to sell off DOVS's clinical practice.  *Id.*  Ganzel fully acknowledged that Dr. Kaplan had previously provided a sufficient explanation for entering the lease; that he received permission directly from her to relinquish DOVS's space in the Brownsboro Road location and in the Novak Building to Norton; that he denied all allegations of seeking a "loan" to finance DOVS's activities; and that he formed Louisville Eye Specialists, LLC on August 15, 2018, as a private company (as the sole founder/employee) to personally finance an international eye hospital in Suzhou, China.  Compl., ¶ 58.  Dr. Kaplan denied any commitment whatsoever to "sell off" DOVS's clinical practice.  *Id.*

Despite Dr. Kaplan's unblemished history, Ganzel informed him that she would be commencing a special chair review to investigate the issues.  Ex. 4 (copying Postel).  Dr. Ganzel indicated that the review would not relate, in any way, to Dr. Kaplan's ongoing work as a clinician, researcher, or educator:   "This will relate only to your role as Department Chair, not as a research scholar, educator or clinician."   *Id.* (emphasis added).   If the concerns were "proven true," Dr. Kaplan faced "disciplinary action up to removal of your chair position."   *Id.* Dr. Kaplan was to be placed on administrative leave only as Chair.   *Id.*

That representation was entirely false given the actions taken before any "investigation":

- Dr. Kaplan's November 14, 2018 meeting with the special chair review committee was canceled with no explanation, and he was ordered to meet the next day with Ganzel and Paul, who were not on the committee.   Compl., ¶¶ 60-61.
- At the November 15, 2018 meeting, Dr. Kaplan was informed that the Redbook-

---

[5]While the Audit Report states that Dr. Kaplan "agreed to locate" DOVS's pediatric specialty in the Novak building, no documentation supports this conclusion.   Ex. 11, p. 8 and exhibits.

required special chair review committee (Ex. 26, § 3.3.5(D)(3)) had been terminated and the same "concerns" identified on October 16, 2018, were going to be investigated by Audit.   Ex. 5 (copying Paul).

- Dr. Kaplan was placed on immediate and indefinite administrative leave from all University positions.   *Id.*

- It was made clear to Dr. Kaplan that he was immediately PNG – he was prohibited from having any "contact with University personnel and any presence on University property," nor could any University personnel contact him without risk of termination.   Compl., ¶¶ 62-65 and Ex. 6.

It is undisputed that there were no articulated "concerns" at that time, or at any time, with Dr. Kaplan's performance as a tenured faculty member, clinician and/or researcher.   Exs. 5-6. His indefinite PNG status was before any investigation and any chance for him to respond.

3.   By Any Barometer, Dr. Kaplan's Career Ended On November 15, 2018.

Effective November 15, 2018, Dr. Kaplan's separation from the University was a *fait accompli*.   His computers were seized and remain unreturned.   Compl., ¶ 69. Dr. Kaplan was not allowed to teach, practice medicine, or continue research.   *Id.*, ¶¶ 70-93.   His patients' appointments, often made several months in advance, were cancelled.   *Id.*, ¶¶ 72-73.   The disruptions to Dr. Kaplan's clinical practice were briefly summarized by a DOVS's clinician:

> Last, I would like to speak to the immense disruption to the clinical care of Dr. Kaplan's patients that has sadly taken place since his departure.  As the reader is likely aware, Dr. Kaplan is a world authority on ocular inflammatory disease . . . In particular, he has a special expertise in uveitis involving the posterior segment of the eye . . . These rank amongst the most complex, refractory, and devastating diseases in all of ophthalmology . . . As such, Dr. Kaplan saw patients from across this region of the United States whose diseases were progressing despite having seeing multiple ophthalmologists, retina specialists, and uveitis specialists locally. He was seen as the expert consultation of last resort.   After his departure, dozens of patients in precarious clinical condition were stripped of their physician without any explanation . . ..

Ex. 21, p. 3.

The negative effects on Dr. Kaplan's professional standing, reputation, and research were immediate.   Prior to his PNG:   "Dr. Kaplan's research productivity is outstanding;"

"Dr. Kaplan's research is currently funded by an NIH R01" and "[p]eers in the field have commented on the significant area of research supported by this R01 . . .;" "Dr. Kaplan is also a co-investigator or collaborator in several other federally supported grants;" and since 2012, "Dr. Kaplan has published more than 40 manuscripts:" Ex. 2, Section 5(B).   After his PNG, Dr. Kaplan's medical practice, research activities, and mentorship ended, and the following occurred:

- Dr. Kaplan was delisted from a national ophthalmology medical experts list after it was notified he no longer had a clinical practice.   Compl, ¶ 76.

- Before PNG status, Dr. Kaplan was engaged in submitting a proposal for the 2019 annual meeting of the Association for Research in Vision and Ophthalmology, a prestigious conference at which Dr. Kaplan was an annual speaker.   Id., ¶ 79. Dr. Kaplan was unable to continue work on his submissions.   Id.

- The personnel contact ban blocked Dr. Kaplan from work on two research funding grant proposals which required his ongoing work to complete.   Id., ¶ 80.

- Confiscation of his computers eliminated access to and work on ongoing NIH grant projects.   Id., ¶ 81.

- Co-researchers were told to remove his name from grants.   Id. ¶¶ 84-87.

- Without access to his ongoing research, Dr. Kaplan was unable to fill contractual obligations for chapter submissions for a book he was collaborating on, missing the publisher's extended deadline, and was denied access to his books, slides, and other materials necessary to complete the book.   Id., ¶¶ 90-91.

- Dr. Kaplan could not fulfill his important teaching and mentorship role.   Id., ¶ 92.

- Organizations, colleagues, and potential residents were informed that Dr. Kaplan was no longer Chair and/or he was "under investigation."   Id., ¶¶ 93-98.

- The harm to Dr. Kaplan's clinical and research career, and the negative impact on DOVS from his PNG status, has been recognized.   Ex. 21, pp. 1-2.

4.   The Audit Report Was The First Notice That Concerns Beyond The October 25, 2018 Letter Were Investigated To Continue Dr. Kaplan's PNG Status And Revoke His Tenure.

Despite prior assurance of a "timely" investigation (Ex. 4), the Audit investigation results were not provided to Dr. Kaplan until April 29, 2019 (Ex. 22), six months after an investigation began (Exs. 4 and 11), and two weeks after it was completed (Ex. 11).   The investigation had been

unknowingly expanded to include unnoticed allegations of:   violation of HIPAA; violation of the University's conflicts of interest policy; accusations of improperly treating DOVS administrative staff; and DOVS financial mismanagement.   Compl., ¶¶ 109-111.   The Audit Report was the first notice that the University was seeking to revoke Dr. Kaplan's tenure even though <u>the investigation found no issues with his medical practice or research</u>.   *Id.,*  ¶ 112. Inclusion of such new "concerns" was simply to form the basis to "revo[ke] [his] tenure."   *Id.*

During the investigation, Dr. Kaplan was only interviewed once.   On February 12, 2019, Audit scheduled an interview with him on February 28.   *Id.*, ¶ 106, and <u>Ex. 10</u>.   Dr. Kaplan attended the interview and fully cooperated, answering all questions asked of him.   In response to the only reason for which he was told there was an investigation (exploration of alternative funding for DOVS's clinical program), Dr. Kaplan denied any wrongdoing.   Compl., ¶ 114.   He was not informed of the "new" allegations.   *Id.*, ¶ 106.

The non-sale of DOVS "issues" are invalid.   Three examples provide the Court with the skepticism it should attach to the Audit Report's legitimacy.   First, prior to the May 2018 budget cuts, there were no DOVS financial management concerns:   "The financial status of the department in terms of clinical and research revenue appears strong . . .."   <u>Ex. 2</u>, Section D(a)(c).

Second, there was no HIPAA breach.   HIPAA protects individuals' personal health information ("PHI") that can identify him/her and his/her health conditions, treatment, and payments.   <u>Ex. 23</u>, p. 4.   "De-identified health information" neither identifies nor provides a reasonable basis to identify an individual; there are no restrictions under HIPAA on its use.   *Id.*

With full forensic access to Dr. Kaplan's computers, no communications evidencing Dr. Kaplan's alleged PHI disclosure to venture capital groups were identified in or attached to the Audit Report.   <u>Ex. 11</u>.   Any information provided to a venture capital group was non-HIPAA

financial information.   Ex. 24.

When an actual breach is discovered, the University shall notify HHS of the breach. 45 C.F.R. § 164.408.   Additionally, the University has a mandatory duty to notify each individual whose PHI was breached.   45 C.F.R. § 164.404.   A breach involving more than 500 individuals requires media notification within 60 days of the discovery.   45 C.F.R. § 164.406.

The Audit Report (Ex. 11, p. 5) indicated that an "outside forensic firm [was hired] to assist in determining if a breach has occurred in violation of HIPAA."   Dr. Kaplan was contacted by that firm and was required to complete a questionnaire regarding, among other things, how he accessed DOVS PHI and whether he used it for any improper purpose (he did not).   Ex. 12.   The external investigation must have concluded that there was no reportable breach – the University has not reported any breach, much less a breach of 33,000+ patients' PHI.   Ex. 25.

Finally, Dr. Kaplan was accused of improperly treating DOVS faculty and staff.   Ex. 11, p. 6.   Without the goal of terminating Dr. Kaplan from the University, this issue was previously investigated as part of Dr. Kaplan's five-year Chair review, and it was determined that "Dr. Kaplan's leadership and management of the department are praised uniformly and the departmental staff or leadership issues did not come up."   Ex. 2, Section 5(D)(b)(b).

5.   After The Audit Report, Dr. Kaplan Remained PNG And Was Terminated.

On August 1, 2019, Ganzel informed Dr. Kaplan she was seeking his dismissal based entirely on the Audit Report.   Ex. 14.   That same day, Ganzel and Paul resurrected the long-terminated special chair review to "consider" Dr. Kaplan's Chair removal.   Ex. 15.   No reasonable person thought that Paul's review committee would conduct an impartial investigation or reach a result at odds with Ganzel's dismissal.   Ex. 18, p. 1.   This conclusion is evident from

the "procedure" of the "new" special chair review.[6]   Before Audit's involvement, the original special chair review committee had scheduled a face-to-face meeting with Dr. Kaplan; the "new" committee limited Dr. Kaplan to a single written response.   Compl., ¶ 60; Ex. 15.   Not surprisingly, Paul "recommended" removing Dr. Kaplan as Chair.   Ex. 19.   On September 13, 2019, the University rubber-stamped the sham special chair review.   Ex. 20.

In response to the August 1, 2019 letter, Dr. Kaplan could only request a grievance hearing before the Faculty Grievance Committee.   Ex. 14.   He also requested, through counsel, that Defendants enter a tolling agreement for the parties to complete the grievance proceeding before he had to file suit.   Ex. 27.   Defendants refused.   Id., October 25, 2019 email.

Dr. Kaplan's grievance process was completed on January 23, 2020.   Compl., ¶ 139. According to the University Redbook, "[i]f the Committee concludes that the evidence has not established adequate cause for dismissal on the record, it will so report to the Office of the Report." Ex. 26, Appendix:   Termination Procedures, Section IV(m).   The grievance committee made no termination recommendation.   Compl., ¶ 140.   To the contrary, "[t]he Hearing Panel makes no finding whether, as a matter of discretion, termination was warranted given that Grievant did not commit all of the grounds listed in the [Dean Ganzel August 1, 2019] termination letter."   Ex. 28, p. 2.   Nevertheless, the University proceeded with termination, and on April 23, 2020, it rubber-stamped Dr. Kaplan's termination.   Exs. 29-30.

## LAW AND ARGUMENT

A.        **Legal Standard For Evaluating Defendants' Motion.**

To defeat a FRCP 12(b)(6) motion, a plaintiff need only show that the complaint offers "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[6]The arbitrary special chair review and recommendations violated the Redbook § 3.3.5(D)(3).   Ex. 26.

face.'"   *Iqbal*, 556 U.S. at 678, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   The court must "(1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true."   *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009).   In ruling on a FRCP 12(b)(6) motion, the Court weighs only the sufficiency of the complaint, a much lower standard than summary judgment.   *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012); *Thomas v. Briggs*, No. 15-10210, 2018 WL 2002142, at *2 (E.D. Mich. Apr. 30, 2018).

Determining whether a complaint has sufficiently stated a claim is context-specific, requiring the court to draw on judicial experience and common sense.   *Iqbal*, 556 U.S. at 679.   A complaint only requires a "short and plain statement of the claim showing that the pleader is entitled to relief."   FRCP 8(a)(2).   While that requires more than labels, conclusions, or "a formulaic recitation of the elements of a cause of action," it does not require detailed factual allegations.   *Iqbal*, 556 U.S. at 678.

Defendants' Motion does not pass muster under the FRCP 12(b)(6) review standard.   Dr. Kaplan has stated more than sufficient allegations, with supporting exhibits, showing he has valid claims for relief.   Moreover, Defendants rely throughout on authority decided under the summary judgment standard to muddle the bright line distinction between the two standards, leading to improper conclusions.   Defendants' Motion must be denied.

### B.   The University Is Not Entitled To Sovereign Immunity.

The University argues for Eleventh Amendment immunity, but immunity does not extend to claims for prospective injunctive relief such as those brought by Dr. Kaplan.   *Ex Parte Young*, 209 U.S. 123 (1908); *Stringfield v. Graham,* 212 Fed. Appx. 530 (6th Cir. 2007).   To determine the applicability of *Ex Parte Young*, "a court need only conduct a straightforward inquiry into

whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted). The focus is on whether ongoing harm is alleged and relief requested, not the merits of the requested relief. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474 (6th Cir. 2008). Finally, a plaintiff's Article III standing to seek injunctive relief is determined with reference to the plaintiff's position at the time they first join the action. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004).

Here, whether Dr. Kaplan stated a claim for injunctive relief must be assessed with reference to the time he entered the action, with reference to the original complaint. There, Dr. Kaplan alleged Defendants, among other things, banned him from campus, interfered with his clinical practice, removed him as PI on two research grants, impeded his scholarship, and left him in limbo – suspended indefinitely with no idea if or when the ongoing constitutional deprivations might abate. In other words, Dr. Kaplan established "classic claims of ongoing violations of federally-protected property and liberty rights." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998), discussing *Coakley v. Welch*, 877 F.2d 304 (4th Cir. 1989).

Defendants suggest that Dr. Kaplan's termination means that harm is not ongoing, and as a result neither is his right to prospective injunctive relief. This logic turns reason on its head, and would permit state actors to circumvent prospective injunctive relief altogether by the simple expedient of firing anyone who complained. "[A] future injunction is not made retrospective merely because it recognizes that an ongoing violation of law is the result of a past wrong." *CSX Transp., Inc. v. Bd. of Public Works of State of W. Va.*, 138 F.3d 537, 541-42 (4th Cir. 1998).

Dr. Kaplan has stated a valid claim for prospective injunctive relief. Suggesting that Dr. Kaplan's request for injunctive relief is not sufficiently detailed misses the mark. The

12

complaint need not define the precise nature of the relief requested.   *Perez v. Wade*, 652 F.

Supp. 2d 901, 907 (W.D. Tenn. 2009).   The precise scope may be fashioned as discovery

reveals the full picture of Defendants' unconstitutional conduct.   *Dunn v. Spivey*, No. 2:09–

0007, 2009 WL 1322600, *5 n. 4 (M.D. Tenn. May 11, 2009).

### C.        Dr. Kaplan Was Deprived Of Protected Property Interests.

1.        Dr. Kaplan's Tenure Position Creates A Property Interest, And The Rights Granted Tenured Faculty Are Part And Parcel Of That Interest.

Defendants' first Motion urged the Court to view Dr. Kaplan's case as "identical" to

*Crosby v. Univ. of Ky.*, 863 F.3d 545 (6th Cir. 2017), arguing that this case is only about his

removal as DOVS Chair.   They have expanded that argument and contend that the rights

afforded researchers and clinicians do not constitute a property interest.   Defendants are wrong:

first because Dr. Kaplan's termination laid to rest any doubt that the Complaint alleges the

deprivation of a protected property interest; and second, because the concept of property under

the Fourteenth Amendment is not as rigid as Defendants apparently believe.

Nowhere do Defendants argue that Dr. Kaplan's position as a tenured faculty member

does not represent a protected property interest; they cannot.   It is undisputed that the

Constitution protects university tenured faculty in Kentucky because the law creates a liberty and

property interest in such positions.   *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577

(1972); *Edinger v. Bd. of Regents of Morehead State Univ.*, 906 F.2d 1136, 1138-39 (6th Cir.

1990), citing KRS 164.360(1).   Such interests have due process protections that attach before a

university can deprive the subject faculty member of his tenured position/privileges. *Roth*, 408

U.S. at 576; *Stringfield v. Graham*, 212 F. App'x 530, 538 (6th Cir. 2007).

Dr. Kaplan has shown the existence and deprivation of a protected property interest.   For

purposes of the Motion, the Court need not concern itself further with the specific contours of

that interest, which is an inquiry better suited for summary judgment.   Nonetheless, Defendants' comparison to *Crosby* is misplaced.   There, the plaintiff was removed as chair but remained a tenured faculty member.   *Crosby*, 863 F.3d at 552, 556.   Here, Defendants removed Dr. Kaplan from all positions protected by his tenure status that he had held for 18 years – clinician, researcher, and teacher.

Further, in *Crosby*, the plaintiff relied on an unadopted University regulation as the basis of a property interest in his Chair position.   *Id.* at 551, 554.   Dr. Kaplan's property interest springs from his grant of tenure with an unquestionable foundation in Kentucky and federal law. *Edinger*, 906 F.2d at 1138.   Questions as to what rights fall within that tenure such as Dr. Kaplan's rights relating to research and scholarship and as Chair are not susceptible to dismissal under *Crosby* because that plaintiff failed to establish any protected property interest.

Defendants are wrong in their hidebound read of case law that any asserted property interest must be enumerated in a contract or granted by statute.   The Supreme Court has described "property" and "liberty" as "broad and majestic" terms relating to the "whole domain of social and economic fact."   *Roth*, 408 U.S. at 576.   Courts recognize that privileges such as participating in grant-funded research, engaging in scholarship, and maintaining one's standing in academia may themselves create independent property rights.   *Smock v. Bd. of Regents of Univ. of Mich.*, 353 F. Supp. 3d 651, 657 (E.D. Mich. 2018); *Malla v. Univ. of Conn.*, 312 F. Supp. 2d 305, 321 (D. Conn. 2004).   And such rights need not be expressly spelled out in a handbook or contract, but may be inferred from traditions of academic freedom and other customs and understandings effectively establishing an entitlement.   *Hamid v. John Jay Col. of Crim. J.*, 2000 WL 666344, No. 99-CV-8669-WK, at *5-6 (S.D.N.Y. May 19, 2000).

The Complaint establishes that Dr. Kaplan possessed a protected property interest in his tenured position and that Defendants deprived him of that interest.   The Court should ignore Defendants' attempts to divert attention from those simple facts.

 2. Defendants' Actions Impugned Dr. Kaplan's Liberty Interest In Continuing His Profession.

Defendants argue that Dr. Kaplan has not been deprived of his liberty interest in continuing his career as a physician and medical researcher because:   (1) the Complaint does not sufficiently allege that Defendants made stigmatizing statements; and (2) "there is nothing in the Complaint to infer that the Defendants deprived him of the right to pursue his chosen profession outside the University."   The Complaint establishes a liberty interest and states facts sufficient to establish a violation of that interest.

The "freedom to choose and pursue a career, to engage in any of the common occupations of life, qualifies as a liberty interest which may not be arbitrarily denied by the State."   *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir. 1989) (internal citations and quotations omitted).   "The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in their 'reputation, good name, honor, and integrity.'"   *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002), quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989).   An individual's liberty interest is "impugned when a state actor 'stigmatize[s]' an individual by means of 'voluntary, public dissemination of false information' about the individual."   *Id.* at 320.   The notice and opportunity to be heard to protect one's liberty interest are crucial when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him . . .."   *Roth*, 408 U.S. at 573.   And the damage to a person's liberty interest "must be tied to [s]ome alteration of a right or status previously recognized by state law."   *Quinn*, 293 F.3d at 319 (internal quotations omitted).

Defendants claim that Dr. Kaplan "fraudulently" attempted to sell DOVS's clinical practice to a venture capitalist.   Later, Defendants argue, apparently without irony, that Dr. Kaplan fails to allege that Defendants made statements harmful to his reputation.   Motion, p. 11.   To begin, Dr. Kaplan challenges the truth of the Audit Report.   Compl., ¶¶ 116-129. Dr. Kaplan alleges that Defendants made publically known his PNG status at the University. *Id.*, ¶¶ 84-86, 93-100, 152.   Courts recognize that the stigma of PNG status and ostracism are cognizable deprivations of a liberty interest.   *See, e.g., Lara v. Cowan*, 848 F. Supp. 1456, 1460 (D. Ariz. 1994); *Strother v. S. Calif. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996). Further, if the proceedings resulting in Dr. Kaplan's termination are disclosed as part of his personnel record, a question that cannot be answered at this point, courts have held that alone is sufficient to implicate a deprivation of a liberty interest.   *Brandt v. Bd. of Cooperative Educ. Servs.*, 820 F.2d 41, 45 (2d Cir. 1987).

Finally, for purposes of the Motion, the Court must accept as true the contentions that the actions taken against Dr. Kaplan are "stigmatizing" insofar as the possibility of Dr. Kaplan taking advantage of other employment opportunities may be foreclosed to a 77 year old physician and professor who has been illegally terminated from his tenured position.   After all, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013).   Termination is present here, satisfying the standard.

     3.   <u>Defendants Did Not Provide Dr. Kaplan With Notice Or An Opportunity To Be Heard, And He Has Adequately Pled A Due Process Violation</u>.

Prior to terminating a tenured faculty member from a public university, the Constitution

requires, at a minimum, that the individual be granted notice of the charges against them and a meaningful opportunity to be heard. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005). This must include an explanation of the employer's accusations and a meaningful chance to share the plaintiff's side of the story. *Gunasekera v. Irwin*, 551 F.3d 461, 469 (6th Cir. 2009), citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, (1985).

Dr. Kaplan was stripped of his duties and was designated PNG prior to receiving any notice of the allegations against him, let alone an opportunity to be heard. Compl., ¶¶ 65-66, 106, 111-112. Dr. Kaplan further alleges that the Audit Report was improperly expanded without notice nor an opportunity to be heard to include accusations of violating HIPAA, violating the University's conflicts of interest policy, financial mismanagement, and poor treatment of personnel. Compl., ¶¶ 109-110. These allegations alone are sufficiently detailed to survive a motion to dismiss. *Gunasekera,* 551 F.3d at 4, n 69 (reversing dismissal where plaintiff had merely alleged a lack of notice and opportunity to be heard).

Notably, Defendants fail to address Dr. Kaplan's allegations that the University added to the charges against him without notice, that Dr. Kaplan alleges a second special chair review was recommended without notice, and that Dr. Kaplan was limited in his response to the sham chair review to a single written denial with no ability to mount a meaningful defense. *Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir.1990) (opportunity to respond must be meaningful). This case plainly presents competing narratives, and as this Court recently explained to some of these same Defendants, the opportunity for the accused to be heard and cross-examine witnesses is particularly compelling where inconsistent versions of events lead to opposite conclusions, and a person's reputation and livelihood may hinge on the outcome. *Frost v. Univ. of Louisville*, 392 F. Supp. 3d 793, 806 (W.D. Ky. 2019).

Defendants present arguments that ignore the substance of Dr. Kaplan's complaint and present their own version of facts, something which would be appropriate, if at all, on a motion for summary judgment. *See Scholl v. Harmon*, Civil No. 5:14–cv–270–JMH, 2014 WL 5306665, at *4 (E.D. Ky. 2014).   Dr. Kaplan has adequately pled (1) that he possessed protected liberty and property interests; (2) that Defendants deprived him of those protected interests; and (3) that Defendants did so with constitutionally deficient means.

### D.   Dr. Kaplan Has Been Deprived Of A Substantive Due Process Interest.

Defendants argue Dr. Kaplan has failed to state a substantive due process violation, but their argument does not meaningfully articulate why.   Instead, Defendants offer further evidence that Dr. Kaplan was the victim of termination following a sham investigation with their inclusion of an unserious footnote restating Defendants' bizarre and false claim that Dr. Kaplan conspired to sell part of the University.   Motion, p. 13, fn 102.

Substantive due process "protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988).   Where violation of a property or liberty interest is shown, substantive due process protections are available.   *Id.*, citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 106 (1985).   The Sixth Circuit recognizes two species of substantive due process violations:   "(1) official acts that are unreasonable, arbitrary and cause a deprivation of a substantive right specified in the Constitution, or (2) official acts that 'may not take place no matter what procedural protections accompany them.'"   *Parate*, 868 F.2d at 831, quoting *Wilson v. Beebe*, 770 F.2d 578, 586 (6th Cir. 1985).

Defendants' arbitrary and capricious actions deprived Dr. Kaplan of his First Amendment and academic freedom rights.   Academic freedom is a "special concern of the First

Amendment[,]" and "[t]hat a teacher does have First Amendment protection under certain circumstances cannot be denied." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *Fowler v. Bd. of Educ.*, 819 F.2d 657, 662 (6th Cir. 1986).   Here, by depriving Dr. Kaplan of his right to conduct research, communicate with his colleagues, and otherwise express himself through the medium of scholarship, the University has violated and continues to arbitrarily violate Dr. Kaplan's right to academic freedom.   *Parate*, 868 F.2d at 828.   This compelled gag and prior restraint infringes on Dr. Kaplan's First Amendment rights.   *Id.* (requiring professor to change student's grade represented substantial burden on First Amendment rights).

Dr. Kaplan has stated a claim for a substantive due process violation by adequately pleading Defendants' deprivation of his protected right to academic freedom.

### E. Dr. Kaplan Has Valid Kentucky Constitutional Claims.

Dr. Kaplan is not requesting a new cause of action under the Kentucky Constitution.   He is rightfully claiming that his due process rights afforded by the Kentucky Constitution have been violated for which he is entitled to relief.   Unlike the plaintiff in *St. Luke v. Straub*, 354 S.W.3d 529, 536 (Ky. 2011) (cited by Defendants), Dr. Kaplan did not bring a private cause of action under KRS 446.070 for a constitutional violation.   Compl., ¶¶ 161-173. Dr. Kaplan seeks declaratory and injunctive relief against Defendants for their violations of the Kentucky Constitution, relief available to rectify Defendants' violations.   *Com. v. Ky. Ret. Sys.*, 396 S.W.3d 833, 840 (Ky. 2013) ("The state is not above its own constitution and laws.").

Defendants also rely on *Alexander v. Univ. of Ky.*, No. 5:10-CV-48-REW, 2012 WL 1068764 (E.D. Ky. Mar. 28, 2012).   *Alexander* involved a maintenance employee seeking damages for claims related to age and race discrimination, issues not relevant here.   While the *Alexander* court concluded that the University of Kentucky was entitled to immunity, it was in

the context of plaintiff's damages claims, not prospective injunctive relief.   *Id.* at *11.

Defendants also rely on *Larison v. N. Ky. Univ.*, No. 2013-CA-001721-MR, 2016 WL 1069130, at *5 (Ky. App. Mar. 18, 2016), which also is not applicable.   In *Larison*, the plaintiff complained that he was denied tenure (as opposed to Dr. Kaplan's tenure revocation) because of his age and brought damages claims under the KCRA and Kentucky Constitution.   Relying on *St. Luke*, the *Larison* court determined that because plaintiff could vindicate his rights under the KCRA, it did not need to create a new constitutional private cause of action.   *Larison*, 2016 WL 1069130 at *5.   As discussed above, *St. Luke* does not apply in this case.

## F.    Dr. Kaplan Has Valid Tortious Interference Claims.

The following are the elements of Dr. Kaplan's tortious interference claims:   "(1) the existence of a valid business relationship or its expectancy;  (2)  the defendant's  knowledge thereof;  (3)  the defendant's intentional act of interference;  (4)  the defendant's improper motive; (5) causation; and (6) special damages."   *Church Mut. Ins. Co. v. Smith*, No. 3:14-CV-749-JHM, 2017 WL 5987691, at *4 (W.D. Ky. Dec. 1, 2017), citing *Ventas, Inc. v. Health Care Prop. Investors, Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009).   Evidence of malice <u>or</u> "significantly wrongful conduct" shows the Defendants' improper conduct.   *Id.*   "[T]he question of whether [defendants'] motivation was improper is one for jury determination."   *All Members of the Nat'l Collegiate Athletic Assoc. v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988).

Dr. Kaplan has valid tortious interference claims against Defendants.   As a clinician:  (1) Dr. Kaplan had ongoing relationships with his patients, which were expected to continue while he remained  a  practicing  clinician;  (2)  Defendants  knew  of  his  ongoing  clinical  duties;  (3) Defendants' intentional actions in making Dr. Kaplan PNG on campus interfered with his ongoing patient treatments; (4) the overriding motive for doing so was to terminate his tenure status; (5)

20

Defendants' actions were the cause of Dr. Kaplan no longer treating his patients; and (6) Defendants' actions resulted in damage to Dr. Kaplan by ending his medical career.  Compl., ¶¶ 71-76, 182-198.  As a medical researcher:  (1) Dr. Kaplan had ongoing research projects, grants, book contracts, and collaborators; (2) Defendants knew Dr. Kaplan was engaged in ongoing research as a tenured faculty member; (3) the Defendants' intentional actions in making Dr. Kaplan PNG on campus property and prohibiting him from contact with University colleagues interfered with his ongoing research; (4) the overriding motive for doing so was to terminate his tenure; (5) Defendants' actions were the cause of Dr. Kaplan not being able to continue researching; and (6) Defendants' actions resulted in damage to Dr. Kaplan by ending his research career.  *Id.*, ¶¶ 77-92, 182-198.  A reasonable jury could certainly find that Defendants' baseless actions constituted improper motive.  *Hornung*, 754 S.W.2d at 858.

The case law cited by Defendants does not support the Motion:

- Defendants cite to *Kalderon v. Finkelstein*, No. 08 Civ. 9440(RJS)(THK), 2010 WL 9488933 (S.D.N.Y. Mar. 10, 2010) (*see* Motion, p. 16, fn 119) to argue they could not have interfered with Dr. Kaplan's research because research grants are awarded to a sponsoring institution, not a PI, and thus Dr. Kaplan had no expectancy in research grants.  Unlike Dr. Kaplan, Kalderon was a non-tenured research scientist terminated by the New York College of Podiatric Medicine in the last year of the NIH grant at issue, and the College relinquished the grant upon plaintiff's termination.  *Id.* at *3.  Here, the University terminated Dr. Kaplan and held onto the NIH grant.   Defendants also failed to acknowledge that the *Kalderon* court discussed, in detail, a case on actual point, *Hamid*, 2000 WL 666344:

"In *Hamid*, <u>the plaintiff, a tenured professor</u>, sued his employer, a state university, and affiliated university employees, for removing and replacing him as PI on two federally funded research projects.  **The district court found that the plaintiff had sufficiently alleged a property interest in his PI status to survive a motion to dismiss**.  In reaching this conclusion, the court emphasized that "**the scope of academic interests evoking procedural due process requirements reaches well beyond the core protection of tenured positions**."  *Id.* at *5.  Included in **a tenured professor's rights is "the right to pursue scholarship," and "the right to guide a research project and receive funding therefore constitutes an integral part of social science scholarship**."  *Id.* at *6.  In addition, with the loss of his PI status, the plaintiff suffered a loss of compensation from the college.  **The**

**court was therefore prepared to allow the plaintiff "the chance to show that the College fostered a custom and mutual understanding that its faculty and administration would not interfere with a tenured professor's research**." *Id.*; see also *id.* (increase in compensation of plaintiff as a result of PI position, combined with "'tenure right' to unimpeded research ... (if proven) constitutes a substantive rule of entitlement independent of [plaintiff's] source of funding")." *Kalderon*, 2010 WL 9488933, at *14.   (Emphasis added.)

- Defendants' argument that "an entity cannot interfere with its own contract" relating to removal of Dr. Kaplan from his NIH grant at issue conflates his claim with one for tortious interference with contract.   Dr. Kaplan's prospective business advantage claim does not require a contract.   *Seeger Enters., Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 797 (Ky. App. 2017).

- Defendants cite *Liu v. Northwestern Univ.*, 78 F. Supp. 3d 839, 852 (N.D. Ill. 2015) to argue that the physician-patient relationship is terminable at will and Dr. Kaplan had no ongoing expectancy in his patients.   First, that case was decided under Illinois state law.   Second, in *Liu*, it was a party (the doctor) to the subject physician-patient relationship who terminated it.   Here, Dr. Kaplan's patient relationships were not terminated by him or his patients, and the inference that he was just another ophthalmologist is absurd.   Compl., ¶¶ 74-75; Ex. 21.

- Defendants claim they could not interfere with Dr. Kaplan's research they knew nothing about.   Dr. Kaplan's five-year Chair review completed by the University and approved by Ganzel included a review of his research.   Ex. 2, Section 5(B). Moreover, by their own admission, **Defendants knew of the interference with his book contract (*Clinical Cases in Uveitis: Diagnosis and Management*, Elsevier) and other research projects when Ganzel sent Dr. Kaplan a letter during his PNG status** to clarify he could communicate with research colleagues only to "secure due acknowledgement on these works."   Ex. 9 (Paul was copied).

- Defendants claim they had no improper motive, but Dr. Kaplan has more than sufficiently alleged improper motive.   *Church Mut. Ins. Co.*, 2017 WL 5987691 at *4; *Hornung*, 754 S.W.2d at 858.   This is especially true since Defendants rely on an alleged HIPAA breach of 33,000 patients' PHI to terminate Dr. Kaplan after their investigation determined there was no HIPAA breach.   Compl., ¶¶ 116-123.

## G.   Postel Is A Proper Defendant.

FRCP 8(a)(2) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief."   *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).   The rules require "no more to stave off threshold dismissal for want of an adequate statement."   *Id.*; *El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly*

and *Iqbal* have raised the bar for pleading, it is still low.").   Every reasonable inference must be drawn in the light most favorable to the non-moving party.   *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Dr. Kaplan's Complaint and supporting materials meet this standard, setting forth sufficient allegations to state claims against Postel, the University's Interim Executive Vice President, Ganzel's superior, and a participant in the events at issue.   Compl., ¶¶ 48-59; Ex. 4. In May 2018, Postel met with Dr. Kaplan and verified his authority to enter a new lease with Springs Medical Center for DOVS.   Compl., ¶¶ 48-56.   Yet, five months later, on October 16, 2018, Postel and Ganzel met with Dr. Kaplan to inform him of the fabricated "concerns" with his performance, including entering the subject lease.   *Id.*, ¶¶ 57-59; Ex. 4.   Postel and Ganzel then oversaw an investigation, first through a "special chair review committee," then through Audit, the clear goal of which was to remove Dr. Kaplan from the University.   *Id.*, ¶¶ 57-141, Ex. 4.   Defendants' argument that Postel's position is not enough to make him a Defendant ignores Postel's participation in and oversight of the actions that have harmed Dr. Kaplan.

Defendants' reliance on *Reed v. Haney*, 5:10-228-KCC, 2014 WL 1117492 (E.D. Ky. Mar. 20, 2014), is misplaced.   The *Reed* court granted Defendants' motion to dismiss 41 of the 52 plaintiffs because they did not identify any named defendants who took actions against them, nor did they make a single factual allegation related to the warden defendant.   *Id.* at *3-4.   Here, Dr. Kaplan has made factual allegations against Postel as to his known role in the decision(s) to start taking adverse actions beginning with the initiation of a purported "investigation" of Dr. Kaplan on October 16, 2018, which culminated in the termination of his tenured position. These specific allegations against Postel are significantly more than any made by the dismissed *Reed* plaintiffs against the defendants in that case.

**H.      Dr. Kaplan Has Standing To Seek A Declaratory Judgment.**

A plaintiff possesses standing to pursue declaratory relief if they are "subject to 'an actual present harm or a significant possibility of future harm.'"   *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 833 (6th Cir. 2001), quoting *Nat'l Rifle Ass'n v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). Jurisdictional matters have long been assessed as of the time an action is filed and will not be ousted by subsequent events.  *Smith v. Sperling*, 354 U.S. 91, 93 n. 1 (1957).   Standing is no exception, as the Supreme Court explained when holding that the Friends of the Earth had standing to pursue injunctive relief based on conditions present at the time their action was filed.   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 184 (2002).

Whether a plaintiff has standing to seek declaratory relief is measured by the presence of either harm or a significant possibility of future harm when the case is filed.   *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001).   The plaintiff need not show continued harm throughout the case to maintain standing to seek declaratory relief.   *Id.* at 524. This approach is consistent with the notion that standing exists to ensure that a plaintiff had a viable claim that the defendant's unlawful conduct was occurring when the case was filed.   *Id.*

Defendants' attempt to distinguish between declaratory relief against the individual defendants and that against the University is meaningless.   The only question relevant to whether Dr. Kaplan's declaratory relief request can survive is whether, at the time of filing, Defendants' actions had harmed or eminently threatened to harm him.   When Dr. Kaplan filed this action, he had not yet been terminated.   He had, however, been stripped of all privileges associated with his tenure position, and termination was all but assured.   That the University has now terminated him does not convert Dr. Kaplan's claim for declaratory relief into a standard damages claim, and Dr. Kaplan is entitled to pursue declaratory relief as a matter of law.   *Kelley v. Shelby Cty. Bd. of*

*Educ.*, 198 F. Supp. 3d 842, 850 (W.D. Tenn. 2016) (FMLA plaintiffs maintained standing to pursue declaratory relief notwithstanding fact that they had retired).

Defendants also seek dismissal of Dr. Kaplan's declaratory judgment claim authorized by the Kentucky Declaratory Judgment Act.   Defendants rely on cases in which courts determined that the complaint at issue did not raise a substantial federal question (*Funderwhite v. Local 55, United Ass'n*, 702 F. App'x 308, 313 (6th Cir. 2017)), and cases in which the Court had jurisdiction based only on diversity (*Travelers Indem. Co. of Conn. v. Bowling Green Prof'l Assocs.*, PLC, 440 F. Supp. 2d 652 (W.D. Ky. 2006)).   These cases are irrelevant.   As Dr. Kaplan has pled claims invoking both federal question jurisdiction and state law claims, this Court may consider both the federal and state declaratory judgment statutes by exercising supplemental jurisdiction. *Dimensional Music Publ'g, LLC v. Kersey ex rel. Estate of Kersey*, 448 F. Supp. 2d 643, 652 (E.D. Pa. 2006) ("Requiring plaintiff to try this case to two separate courts is not just inconvenient, but inefficient.").

## I.      Dr. Kaplan Is Entitled To Prospective Injunctive Relief.

Defendants argue Dr. Kaplan does not state a claim for prospective injunctive relief. Dr. Kaplan addressed this argument in Part B *supra*, and relies on the arguments and authorities cited in that section.

## <u>CONCLUSION</u>

For the reasons detailed above, the Motion failed to establish Defendants' entitlement to a dismissal of Dr. Kaplan's claims against them.   Therefore, Defendants' Motion must be dismissed, and Defendants should be ordered to file their answers to the Amended Complaint.

Respectfully submitted,

/s/ *Kevin L. Chlarson*
Dennis D. Murrell
Kevin L. Chlarson
Katherine T. Reisz
Christopher K. Stewart
MIDDLETON REUTLINGER
401 South Fourth Street, Suite 2600
Louisville, Kentucky 40202
(502) 584-1135
(502) 561-0442 (Fax)
dmurrell@middletonlaw.com
kchlarson@middletonlaw.com
kreisz@middletonlaw.com
cstewart@middletonlaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 10, 2020, this document was electronically filed through the Court's ECF system, which will send notice of electronic filing to all persons registered.   It is further certified that a copy of same was served on June 10, 2020, via electronic mail, upon:

Donna King Perry
Matthew Barszcz
Chase M. Cunningham
DINSMORE & SHOHL, LLP
101 South Fifth Street, Suite 2500
Louisville, Kentucky 40202
donna.perry@dinsmore.com
matthew.barszcz@dinsmore.com
chase.cunningham@dinsmore.com
*Counsel for Defendants*

/s/ *Kevin L. Chlarson*
*Counsel for Plaintiff*