**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

**HENRY KAPLAN, M.D.**                                          **PLAINTIFF**

**vs.**                                          **CIVIL ACTION NO. 3:19-CV-825-CRS**

**UNIVERSITY OF LOUISVILLE et al.**                                          **DEFENDANTS**

**MEMORNADUM OPINION**

## I.      Introduction

This matter is before the Court on Defendants University of Louisville (the "University"),
Dr. Toni Ganzel ("Dean Ganzel"), Dr. Ronald Paul ("Dr. Paul"), and Dr. Gregory Postel's ("Dr.
Postel"), motion to dismiss. DN 16. The Plaintiff, Dr. Henry Kaplan ("Dr. Kaplan"), has responded
and the Defendants replied. DN 19; DN 21. The matter is now ripe for review. For the following
reasons, the Court will grant Defendants' motion to dismiss.

## II.      Factual Background

This case arises from an investigation into Dr. Kaplan's actions as Chair of the Department
of Ophthalmology and Visual Sciences ("DOVS") at the University's School of Medicine. Dr.
Kaplan was a tenured professor at the University and had served as the DOVS' Chair since 2000.
DN 15 at ¶ 29. Dr. Kaplan's most recent five-year term as department Chair was anticipated to run
from 2017 to 2022. *Id.* at ¶ 36.

According to Dr. Kaplan's amended complaint, in May of 2018, the University announced
cost control measures for the 2019 fiscal year that would directly affect the DOVS. *Id.* at ¶ 37. In
response to these measures, Dr. Kaplan began to research alternative revenue sources. *Id.* at ¶ 40.
One such revenue source "widely known to be available in the medical field of ophthalmology,"
Dr. Kaplan alleges, would have been for the DOVS to sell its clinical practice to a private equity

group. *Id.* at ¶ 41. In researching this potential revenue source, Dr. Kaplan "had detailed communications with four investments groups" regarding a potential purchase of the DOVS' clinical practice. *Id*. at ¶ 45.

At approximately the same time, Dr. Kaplan alleges that he began to inquire about leasing a new workspace for the DOVS' clinical practice, University of Louisville Physicians-Eye Specialists ("ULP"). *Id.* at ¶ 49. Dr. Kaplan states that he asked ULP's CEO whether the DOVS could lease more office space in the ULP's current location, the Springs Medical Center located at 6400 Dutchmans Parkway in Louisville. *Id.* at ¶ 48–50. ULP's CEO informed him that there was no office space available. *Id.* at ¶ 50. Despite being told that no office space was available, Dr. Kaplan "began working to secure a lease at [the Springs Medical Center]" for more office space. *Id.* at ¶ 52. On May 21, 2018, Dr. Kaplan signed a lease for the new space because "it was in the best interest of the Department." *Id.* at ¶ 54.

On October 16, 2018, Dr. Kaplan met with Dr. Ganzel, Dean of the School of Medicine, and Dr. Postel, the University's interim Executive Vice President. *Id.* at ¶ 57; DN 15-4. Both Dean Ganzel and Dr. Postel had received "several concerns" about Dr. Kaplan's "actions as Chair of the Department of Ophthalmology and Visual Sciences." DN 15-4 at 1. According to the letter from Dean Ganzel to Dr. Kaplan, they discussed the following:

> [W]e discussed your unauthorized execution of a lease on behalf of ULP, failure to honor your initial obligation of the Department to occupy space and use equipment in the PMOB resulting in expense to re-stock equipment, alleged attempt to seek a loan to fund operations outside of ULP's regular financing that could compromise ULP's debt covenant agreement and the creation of an LLC, that if intended to spin-off the clinical practice of the Department into an outside entity, would violate the Practice Plan.

*Id*. Dean Ganzel further stated in the letter that "these actions, if true, range from insubordination and acting outside the scope of your authority as Chair to a potential violation of the Professional

Practice Plan and conflict of interest." *Id.* Based on these allegations, Dean Ganzel instituted a "special chair review" pursuant to § 3.3.5.D.3 of the University's *Redbook*[1] to "ensure a full and fair investigation of these actions and allegations." *Id.*

On November 15, 2018, Dr. Kaplan met with Dean Ganzel and Dr. Ron Paul, Vice-Dean for Faculty Affairs. DN 15 at ¶ 61–62; DN 15-5. Dean Ganzel informed Dr. Kaplan via email that the "Special Chair Review, which commenced in late October, ha[d] ceased and any investigation into the allegations brought to the attention of University officials will continue to be investigated by Compliance and Audit Services." DN 15-5 at 1. Further, Dean Ganzel told Dr. Kaplan that he would be placed on administrative leave with pay immediately and the investigation could result in "disciplinary action, up to and including termination as Chair and/or as a faculty member." *Id.*

As part of his administrative leave, the University prohibited Dr. Kaplan from engaging "in any activity on behalf of the University, including in [his] role as chair, faculty member or physician." *Id.* Dr. Kaplan claims that the administrative leave effectively made him "persona non grata ("PNG") at the University indefinitely." DN 15 at ¶ 65. He further alleges that he suffered several "negative ramifications" as a result of being placed on administrative leave. *Id.* at ¶ 70. First, he alleges that the administrative leave "eliminated [his] ability to treat any of his patients" which affected his patients' care and his "professional standing and reputation." *Id.* at ¶ 71–76. Second, he alleges that the administrative leave "interfered" with several "then-current, awarded grant projects." *Id.* at ¶ 77–92. He further alleges that "the University, through its agents, employees, and representatives, have informed faculty with whom Dr. Kaplan collaborated not to include his name on any manuscripts or grants." *Id.* at ¶ 86.

---

[1] "The Redbook of the University of Louisville is the basic governance document of the University." http://louisville.edu/provost/redbook. Dr. Kaplan's amended complaint incorporates the entire Redbook by reference. DN 15 at p. 26, fn. 3.

Third, Dr. Kaplan alleges that the administrative leave adversely impacted his professional reputation. *Id*. at ¶ 93–100. Specifically, Dr. Kaplan alleges the University, through its agents, employees, and representatives, made four statements that "compounded the negative impact on Dr. Kaplan's professional standing, character, reputation, and integrity": (1) the University told resident candidates that Dr. Kaplan was on administrative leave, *id.* at ¶ 96, (2) the University told the American University Professors of Ophthalmology that Dr. Kaplan was no longer Department Chair prior to his actual removal as Chair, *id.* at ¶ 97, (3) the University contacted the National Eye Institute and informed the organization that Dr. Kaplan was under investigation, *id.* at 98, and (4) the University represented to the Louisville Lions Club that Dr. Kaplan had been replaced as Department Chair, *id*. at 99.

As part of the investigation, Dr. Kaplan met with Audit Services on February 28, 2019. *Id.* at ¶ 106. Audit Services then issued its investigation Report on April 19, 2019. *Id.* at ¶ 96. DN 15-11. The Report ultimately substantiated the allegations against Dr. Kaplan that were outlined by Dean Ganzel during the October 16 meeting, and "identified additional issues" related to Dr. Kaplan's conduct as Department Chair. DN 15-11 at 2. These additional issues included "a HIPAA violation; a violation of the University's conflicts of interest policy; accusations of improperly treating Department administrative staff; and Department financial mismanagement." DN 15 at ¶ 110. Dr. Kaplan claims that these issues were "unnoticed allegations." *Id.* The report recommended that the administration "take appropriate disciplinary action, up to and including termination of Dr. Kaplan's position as Chair of the DOVS and revocation of tenure at the University of Louisville." DN 15-11 at 2. Dr. Kaplan contends that the report is not credible and "was simply the University's attempt to paper a 'justification' for terminating Dr. Kaplan." DN 15 at ¶ 113.

4

On August 1, 2019, based on the Audit Services Report, Dean Ganzel sent a letter to Dr. Kaplan and the President of the University, Dr. Neeli Bendapudi ("President Benapudi"), that recommended Dr. Kaplan be dismissed as a tenured professor in the School of Medicine. DN 15-14. The letter listed six bases for Dean Ganzel's recommendation: (1) Dr. Kaplan "took steps to separate the Department of Ophthalmology and Visual Sciences' professional practice from the authorized entity (ULP)," (2) Dr. Kaplan "misrepresented ULP data as data from a privately owned practice," (3) Dr. Kaplan "stored patient personal health information and other sensitive personal data in unauthorized cloud storage solutions," (4) Dr. Kaplan "failed to disclose potential financial conflicts of interest," (5) Dr. Kaplan "treated administrative staff in a manner that violated the University's Code of Conduct and core value of treating everyone with dignity and respect," and (6) Dr. Kaplan "engaged in insubordination by undermining the Departmental budget reduction plan." *Id*.

The same day, Dr. Paul emailed Dr. Kaplan notifying him that the Special Chair Review Committee had received the Audit Services Report and that the Committee was providing Dr. Kaplan with an opportunity to respond to the report in writing. DN 15-15. Dr. Paul also stated that the Committee would review Dr. Kaplan's written response and the Audit Services Report before making its final recommendation regarding Dr. Kaplan's chairmanship. *Id*. Dr. Kaplan, through his counsel, responded to this email by stating the Special Chair Review had ceased in October 2018 and he received "no notice prior…that another special chair review had begun." DN 15-16. Dr. Kaplan also stated that he "invoked his right to appeal [Dean Ganzel's] recommendation of dismissal and its purported basis to the University Faculty Grievance committee." *Id*. In response, Dr. Paul emailed Dr. Kaplan's counsel and stated that the Special Chair Review "[did] not constitute a new review, but rather [] a continuation of the Special Chair Review Commenced in

October 2018." DN 15-17. Ultimately, on September 9, 2019, the Special Chair Review Committee recommended to Dean Ganzel that Dr. Kaplan be removed from his Chair position. DN 15-19. On September 13, 2019, President Bendapudi removed Dr. Kaplan from his Chair position. DN 15-20.

Dr. Kaplan's hearing before the Faculty Grievance Committee Hearing Panel took place on November 18 and December 16, 2019. DN 15-28 at 1. Dr. Kaplan and Dean Ganzel called witnesses and submitted documentary evidence. *Id*. The Hearing Panel found that Dean Ganzel had "met [her] burden of showing, by clear and convincing evidence, that [Dr. Kaplan] engaged in four of the six forms of conduct" listed in Dean Ganzel's termination letter. *Id.* at 3. The Hearing Panel stated that Dean Ganzel did not show by clear and convincing evidence that Dr. Kaplan had (1) stored patient personal health information and other personal data in an unauthorized cloud storage solution or (2) treated administrative staff in a manner that violated the University's code of conduct. *Id*. While the Hearing Panel substantiated four of the six grounds for dismissal, it did not make a finding "as to whether, as a matter of discretion, termination was warranted given that [Dr. Kaplan] did not commit all the grounds listed in the termination letter." *Id*.

On February 4, 2020, President Bendapudi sent a letter to Dr. Kaplan which stated "[b]ased on my review of the Findings [and Opinions of the Hearing Panel] and the applicable provisions of the University of Louisville *Redbook*, and notwithstanding the Hearing Panel's conclusions with respect to grounds 3 and 5, I find that adequate cause for dismissal exists and termination is warranted." DN 15-29 at 2. At the recommendation of President Bendapudi, the University's Board of Trustees approved the revocation and termination of Dr. Kaplan on April 23, 2020. DN 15-30.

Dr. Kaplan filed the instant suit on November 12, 2019. DN 1. The parties agreed to allow Dr. Kaplan to file an amended complaint on May 6, 2020. DN 14.

## III.    Legal Standard

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although the complaint need not contain "detailed factual allegations," "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks and alteration omitted). "Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft*, 556 U.S. at 678 (internal quotation marks and citation omitted).

## IV.    Discussion

Dr. Kaplan brings several claims under federal and state law against the University and Dean Ganzel, Dr. Paul, and Dr. Postel (the "Individual Defendants") in their "personal and individual capacity." DN 15 at ¶ 18. Dr. Kaplan brings a claim for alleged violations of his federal procedural and substantive due process rights under § 1983. DN 15 at ¶ 143–160. He also seeks declaratory relief under the federal Declaratory Judgment Act. *Id.* at ¶ 174–175. Further, Dr. Kaplan brings a claim for alleged violations of his procedural and substantive due process rights under Sections One and Two of the Kentucky Constitution. *Id.* at ¶ 161–173. He also seeks

declaratory relief under KRS 418.040. *Id.* at ¶ 176–177. Dr. Kaplan also brings a stand-alone "count" for injunctive relief under "federal and state law." *Id.* at ¶ 178–181. Finally, Dr. Kaplan brings a tortious interference with business relationships and expectancies claim under Kentucky law. *Id.* at ¶ 182–198. The Defendants attack each claim in their motion to dismiss.

### A.      Dr. Kaplan's § 1983 Claims against the University

The Defendants argue that the University is protected by sovereign immunity for all of Dr. Kaplan's claims under § 1983. DN 16-1 at 5. The Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of a Foreign State.

U.S. Const. amend. XI. "This jurisdictional bar applies regardless of the relief sought." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.,* 987 F.2d 376, 381 (6th Cir. 1993) (overruled on other grounds by *Seminole Tribe of Florida v. Florida*, 517 U.S., 44 (1996) (citing *Pennhurst*, 465 U.S. at 100–01)). It is well established that "[t]he University of Louisville is a state agency cloaked with Eleventh Amendment immunity." *Graham v. NCAA*, 804 F. 2d 953, 960 (6th Cir. 1986).

"The Eleventh Amendment has no application under two circumstances: 1) where a state itself has waived its immunity from federal suit; and 2) where Congress has abrogated the states' immunity." *Thiokol Corp.*, 987 F.2d at 381. Further, the Eleventh Amendment does not bar suits brought against state officials in their official capacity for prospective injunctive or declaratory relief under *Ex Parte Young*. *Id.* (citing *Ex Parte Young,* 209 U.S. 123 (1908)). "In order to fall within the *Ex* [*P*]*arte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law." *Diaz v. Mich. Dept. of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). "To

8

determine if *Ex Parte Young* applies, we need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017) (citing *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003)) (internal quotation marks and citations omitted).

None of those circumstances have been alleged here. First, Kentucky has not waived its sovereign immunity for § 1983 claims. *Adams v. Morris*, 90 Fed.Appx. 856, 857 (6th Cir. 2004). Second, Congress did not abrogate Kentucky's sovereign immunity for § 1983 claims. *Whittington v. Milby*, 928 F.2d 188, 193–94 (6th Cir. 1991). Third, Dr. Kaplan fails to plead a viable claim under *Ex Parte Young.* Dr. Kaplan asserts that Defendants "banned him from campus, interfered with his clinical practice, removed him as PI [Principal Investigator] on two research grants, impeded his scholarship, and left him in limbo." DN 19 at 12.These alleged injuries are not current or ongoing. Furthermore, Dr. Kaplan has since been terminated from his tenure position and removed from his department chair position. Whatever remedy Dr. Kaplan is seeking for these alleged injuries would necessarily be righting an alleged past wrong, the proper remedy for which would be damages, not prospective injunctive relief. The Eleventh Amendment bars plaintiffs from suing the State and its agencies for damages and, therefore, shields the University from Dr. Kaplan's claims.

Moreover, Dr. Kaplan's amended complaint does not request a specific form of injunctive relief that can be properly characterized as prospective. DN 15 at ¶ 178–81. As the Sixth Circuit stated in *Boler,*

> [e]ven if we were to find that the Complaint alleges an ongoing violation of federal law, it is not clear what injunctive relief is sought. Though each count alleged requests injunctive relief, and the prayer for relief asks for '[a]ny other relief, including injunctive relief, as [the c]ourt deems fair,' the Plaintiffs provide no indication as to what this injunctive relief might be. Under our plain reading of the

> Complaint, the *Boler* Plaintiffs have not shown that the *Ex Parte Young* doctrine
> applies to their claims against Governor Snyder.

*Boler,* 865 F.3d at 412. Dr. Kaplan's amended complaint fails to state a proper claim under *Ex Parte Young* and does not fall within the other two articulated exceptions to sovereign immunity. Therefore, all his claims against the University are barred by the Eleventh Amendment and will be dismissed.

### B.      Dr. Kaplan's Substantive and Procedural Due Process Claims under § 1983 Against the Individual Defendants

Dr. Kaplan brings a procedural due process claim and substantive due process claim under § 1983 against the Individual Defendants in their "individual and personal capacity." DN 15 at ¶ 18. First, Dr. Kaplan alleges that the Individual Defendants deprived him of four constitutionally protected interests without due process: (1) his property interest in his Department Chair position, (2) his property interest in his tenured position as a clinician, researcher, and faculty member, (3) his liberty interest in pursuing his chosen medical profession and professional livelihood, and (4) his liberty interest in his reputation, good name, honor, integrity, character, and professional standing. *Id.* at ¶ 143, 144, 147, 149. Second, Dr. Kaplan brings a substantive due process claim against the Individual Defendants. Dr. Kaplan alleges that the Individual Defendants "acted in an arbitrary and capricious manner" and "violated Dr. Kaplan's academic freedom and speech." *Id.* at ¶ 154, 156. The Court will address each claim.

### i.      Dr. Kaplan's Procedural Due Process Claim

A procedural due process claim under § 1983 requires the Court to undertake a two-step analysis by asking: (1) whether a protected property or liberty interest exists and, if so, (2) what procedures are required to protect that interest. *Johnston-Taylor v. Gannon,* 907 F.2d 1577, 1581 (6th Cir. 1990). The Individual Defendants argue Dr. Kaplan's Department Chair position is not a

cognizable property interest under the Constitution and that Dr. Kaplan received adequate due process prior to being terminated from his tenured positions. DN 16-1 at 7–9, 12–13. The Individual Defendants also argue that Dr. Kaplan has failed to plead any viable liberty interests that are protected by procedural due process. *Id.* at 9–11. The Court will analyze each argument.

### a.      Dr. Kaplan's Chair Position

To determine whether a benefit rises to the level of a constitutionally protected property interest, the Court must look to "existing rules or understandings that stem from an independent source such as state law." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "A property interest can be created by state statute, a formal contract, or a contract implied from the circumstances" *Singfield,* 389 F.3d at 555 (citing *Perry v. Sindermann,* 408 U.S. 593, 602 (1972)). The core of this analysis is whether there exists a "mutually explicit understanding [] that support[s] [Dr. Kaplan's] claim of entitlement." *Perry,* 408 U.S. at 601. Further, for Dr. Kaplan to be entitled to procedural due process in connection with his alleged property interests, Dr. Kaplan "must demonstrate a 'legitimate claim or entitlement to his position; a mere 'unilateral expectation' or 'abstract need' to continue undisturbed in his post is not enough." *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017) (citing *Roth*, 408 U.S. at 577).

Dr. Kaplan alleges that he has a "constitutionally protected property interest…in his Chair position." DN 15 at ¶ 143. Generally, "tenured university professors [do] not have a constitutionally protected property interest in administrative posts." *Stringfield v. Graham*, 212 Fed.Appx. 530, 538 (6th Cir. 2007). A property interest in an administrative post may only arise "where the administrative position itself is a tenure-track appointment or where a professor has

received an express guarantee that he will not be removed from the position except for cause." *Crosby*, 863 F.3d at 553 (citing *Stringfield*, 212 Fed.Appx. at 537–39).

The Individual Defendants direct the Court to the University's *Redbook* § 3.3.5(A), which Dr. Kaplan incorporated by reference in his amended complaint. DN 16-1 at 8; DN 15 at p. 26, fn. 3. This section states that department chairs "serve at the pleasure of the Board of Trustees and may be removed at any time upon the recommendation of the President." DN 16-1 at 8. Dr. Kaplan does not allege that his Chair position was itself a tenure-track appointment or that he received an express guarantee from the University that he would only be removed for cause. Rather, Dr. Kaplan argues that he has a clear property interest in his tenured position and "the Court need not concern itself further with the specific contours of that interest, which is an inquiry better suited for summary judgment." DN 19 at 13–14. This Wizard of Oz—pay no attention to the at-will position behind the curtain—argument is without merit and contrary to the binding authority of this circuit. Dr. Kaplan fails to provide the Court with any binding or persuasive authority to support his assertion that his Chair position must be considered as part and parcel to his property interest in his tenured position. Further, he does not dispute that his Chair position was, in fact, an "at-will" position. Accordingly, Dr. Kaplan's procedural due process claim brought under § 1983, to the extent it relies upon a property interest in his Chair position, will be dismissed.

b.      **Dr. Kaplan's Position as a Tenured Faculty Member**

Dr. Kaplan asserts that he has a "constitutionally protected interest in his positions as a clinician, researcher, and tenured faculty member" and that he did not receive adequate due process to protect that interest. DN 15 at ¶ 143. It is undisputed that Dr. Kaplan was a tenured professor at the University. *Id.* at ¶ 12; DN 16-1 at 12. It is also well established that tenured faculty at public universities have a constitutionally protected property interest in their continued employment and,

therefore, their employment must be safeguarded by due process. *Roth*, 408 U.S. at 576–577. The Defendants contend that the University gave Dr. Kaplan adequate due process in removing him from his tenured position. DN 16-1 at 12–13.

The Supreme Court has "made clear that there are two basic due process requirements: (1) notice, and (2) an opportunity to be heard." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005). The Sixth Circuit has held that "[p]rofessors with tenure or with a continuing contract may not be discharged without receiving a hearing in which they are informed of the grounds for their dismissal and given the opportunity to challenge the sufficiency of those grounds." *Johnston-Taylor v. Gannon*, 907 F. 2d 1577, 1581 (6th Cir. 1990).

Dr. Kaplan asserts that he did not receive adequate due process for two reasons: (1) he "was deprived of his constitutionally protected interests" immediately upon being placed on administrative leave on November 15, 2018 and should have been provided "constitutionally mandated sufficient notice and opportunity to be heard" prior, DN 15 at ¶ 145–146, and (2) the Audit Services investigation and Report were "improperly expanded without notice nor an opportunity to be heard" to include the "unnoticed allegations" regarding HIPAA, financial conflicts of interest, financial mismanagement, and University Code of Conduct violations. *Id.* at ¶ 110; DN 19 at 17.

Dr. Kaplan relies on *Gunasekera v. Irwin*, 551 F.3d 461, 469 (6th Cir. 2009) for the proposition that he was entitled to due process prior to being placed on administrative leave. DN 19 at 17. But, the facts of *Gunasekera* are inapposite to his case. The plaintiff in *Gunasekera* asserted that the defendants never gave him notice or an opportunity to be heard "*before or after* his suspension*" from the university. *Id.* (emphasis added). The Sixth Circuit held that assertion was enough to survive a motion to dismiss. *Id.* The court did not hold that due process required

the defendants to provide the plaintiff notice and an opportunity to be heard before his suspension. Indeed, this would have been in tension with prior Sixth Circuit precedent. As the Court stated in *Jackson v. City of Columbus*, 194 F.3d 737, 749 (6th Cir. 1999) (abrogated on other grounds by *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002)), "the Supreme Court stated in *Loudermill* that the suspension of a tenured public employee *with pay* [avoids] due process problems entirely. *See Loudermill*, 470 U.S. at 544–55, 105 S.Ct. 1487; *see also Gilbert v. Homar*, 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (expressly acknowledging that the Court has not decided whether the Due Process Clause extends to discipline of tenured public employees short of termination.)" (emphasis in original). Dr. Kaplan fails to provide the Court with any binding or persuasive authority for the proposition that a tenured faculty member at a public university must receive adequate notice and an opportunity to be heard before being placed on administrative leave with pay while he or she is being investigated by the university. Accordingly, the question for the Court reverts to whether Dr. Kaplan's amended complaint sufficiently alleges that he did not receive adequate due process prior to his termination.

The amended complaint demonstrates that Dr. Kaplan received "'oral or written notice of the charges against him [], an explanation of the [University's] evidence, and an opportunity to present his [] side of the story to the [University].'" *Gunasekera,* 551 F.3d at 469 (quoting *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004)). At the completion of the Audit Services investigation, an investigation in which Dr. Kaplan participated, Dr. Kaplan received the Audit Services Report which detailed all of findings against him, including the findings that Dr. Kaplan alleges were "unnoticed allegations." DN 15 at ¶ 108, 110. Based on the Audit Services Report, Dean Ganzel recommended Dr. Kaplan's tenured position be revoked for six specific reasons, all based on the Audit Services Report, which she detailed in the termination letter that was sent to Dr. Kaplan and

14

President Bendapudi. DN 15-14. Kaplan then requested, and received, a hearing before the University's Grievance Committee. DN 15-15; DN 15-28. Over the course of two days, Dr. Kaplan called witnesses and submitted documentary evidence to the panel regarding *all* of the proffered reasons for his recommended termination. DN 15-28. The Grievance Committee Hearing Panel ultimately found that Dean Ganzel had "met [her] burden of showing, by clear and convincing evidence, that [Dr. Kaplan] engaged in four of the six forms of conduct listed in the [termination letter]." DN 15-28 at 3. Based on these findings, the President of the University found "adequate cause for dismissal" and submitted her recommendation to the Board of Trustees that Dr. Kaplan be terminated, which the Board accepted. DN 15-29. Dr. Kaplan's amended complaint demonstrates that received notice of the charges against him and an opportunity to be heard before he was terminated. Accordingly, his claim fails the second prong of the procedural due process inquiry under § 1983 and will be dismissed. *Johnston-Taylor*, 907 F. 2d at 1581.

### c.      Dr. Kaplan's Alleged Liberty Interest to Pursue His Career

Dr. Kaplan has failed to allege a viable liberty interest "in his work with the University." DN 16-1 at 9. It is well established that "'the freedom to choose and pursue a career, 'to engage in any of the common occupations of life,' qualifies as a liberty interest which may not be arbitrarily denied by the State.'" *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir. 1989). But this liberty interest is narrowly tailored; there is no constitutional right to maintain employment at a specific job within an individual's career field. *Id.* at 832. In *Meyer*, the Supreme Court held that the "state action prohibiting the teaching of German in public schools violated a German teacher's Fourteenth Amendment right to pursue the common occupations of life." *Id.* at 832 (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)). The state action in *Meyer* barred the teacher from teaching German at any school in the state. *Meyer*, 262 U.S. at 400. The Sixth Circuit has delineated the liberty interest

15

recognized in *Meyer* from an individual's desire to remain employed in his or her current job. In *Parate*, the Court held that the plaintiff did not have a constitutionally protected liberty interest in teaching at a specific university. *Parate*, 868 F.2d at 832. The Court explained that the plaintiff could "pursue the teaching profession at any public or private university that requests his services," and, therefore, his constitutionally protected liberty interest had not been infringed. *Id*.

Dr. Kaplan fails to allege a constitutionally protected liberty interest in pursuing his career. Dr. Kaplan alleges that he has "a constitutionally protected liberty interest in pursuing his chosen medical profession…[and] in his professional livelihood." DN 15 at ¶ 149. Dr. Kaplan fails to provide any more support for this claim other than "the possibility of Dr. Kaplan taking advantage of other employment opportunities may be foreclosed to a 77 year old and a professor who has been illegally terminated from his tenured position." DN 19 at 16. Even accepting this vague assertion as true, Dr. Kaplan has not alleged that the University is actively preventing him from practicing ophthalmology elsewhere at another university or in private practice; he merely asserts that being terminated might affect his future career prospects. *Id*. This general assertion does not rise to the level of the constitutionally protected liberty interest recognized in *Meyer*. Accordingly, Dr. Kaplan's procedural due process claim, to the extent it relies on this alleged interest, will be dismissed.

### d.    Dr. Kaplan's Alleged Liberty Interest in his Reputation

Dr. Kaplan has also failed to articulate a viable claim that the Defendants violated his liberty interest in his reputation. DN 16-1 at 10. "A person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the Fourteenth Amendment." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (citing *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). "That liberty interest is impugned when a state actor

16

'stigmatize[s]' an individual by means of 'voluntary, public dissemination of false information' about the individual." (*Crosby* at 556.) But, "defamation alone is not enough to invoke due process concerns." *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)). Due process is invoked only when "[s]ome alteration of a right or status 'previously recognized by state law,' such as employment," accompanies the damage to reputation. *Id.* (citing *Davis*, 424 U.S. at 711–712).

"In order to apply these general principles, our circuit 'has identified five factors that a plaintiff must show in order to establish that he was deprived of a liberty interest and entitled to a name-clearing hearing." *Crosby,* 863 F.3d at 554. These factors are: (1) the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment, (2) the employer has alleged more than mere improper or inadequate performance, incompetence, neglect of duty or malfeasance, (3) the stigmatizing statements or charges must be made public, (4) the plaintiff must claim that the charges made against him were false, and (5) the public dissemination of the statements was voluntary. *Id.* at 320. If a plaintiff establishes all five elements, he or she is entitled to a name-clearing hearing. "It is the denial of a name-clearing hearing that causes the deprivation of the liberty interest without due process. Thus, the public employer deprives an employee of his liberty interests without due process, if upon request for a name-clearing hearing, the employee is denied." *Id.* at 320 (internal citations omitted).

Dr. Kaplan alleges that the findings of the Audit Services Report are untrue and "[t]he stigma of [persona non grata] status and ostracism are cognizable deprivations of a liberty interest." DN 15 at ¶ 151–152. Further, Dr. Kaplan alleges the University, "through its agents, employees, and representatives," made four statements that impacted his reputation: (1) the University told "resident candidates that Dr. Kaplan was on administrative leave with no explanation as to why or its duration," *id.* at ¶ 96, (2) the University told the American University Professors of

17

Ophthalmology that Dr. Kaplan was no longer Department Chair before the Audit Services investigation was complete, *id.* at ¶ 97, (3) the University told the National Eye Institute that Dr. Kaplan was "under investigation," *id.* at ¶ 98, and (4) the University told the Louisville Lions Club that he had been replaced as Department Chair, *id.* at ¶ 99.

Even accepting Dr. Kaplan's allegations as true, his complaint fails to state a viable claim. Dr. Kaplan's can only be deprived of due process if he requested a name-clearing hearing and the University denied his request prior to bringing suit. *Frost v. Univ. of Louisville,* 392 F.Supp.3d 793, 807 (W.D. Ky. 2019) (citing *Quinn,* 293 F.3d at 320–21). Dr. Kaplan has alleged neither. Accordingly, this claim will be dismissed.

### ii.     Dr. Kaplan's Substantive Due Process Claim under § 1983

The Individual Defendants argue that Dr. Kaplan has failed to allege a viable claim that the Defendants deprived him of his fundamental First Amendment right to academic freedom. DN 16-1 at 14. "Substantive due process…protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988). Substantive due process protections arise when "an interest in liberty or property" is impaired. *Id.* In the "academic setting," courts may only override a decision under substantive due process "if that decision is 'such a substantial departure from accepted academic norms as to demonstrate the person or committee responsible did not actually exercise professional judgment." *Id.* (citing *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 224–225 (1985)). The Sixth Circuit has recognized two types of substantive due process violations: "(1) official acts that are unreasonable, arbitrary and cause a deprivation of a substantive right specified in the constitution, or (2) official acts that may not take place no matter what procedural protections accompany them." *Parate*, 868 F.2d at 831 (internal quotation marks omitted).

The Supreme Court has recognized a First Amendment right to academic freedom, but its contours are murky. *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603 (1967). As the Sixth Circuit stated, quoting Judge Posner of the Seventh Circuit, academic freedom denotes "both the freedom of the academy to pursue its end without interference from the government…and the freedom of the individual teacher…to pursue his ends without interference from the academy; and these two freedoms are in conflict." *Parate*, 868 F.2d 821 at 826 (quoting *Piarowski v. Ill. Cmty. Coll. Dist.*, 759 F.2d 625, 629 (7th Cir.), *cert. denied*, 474 U.S. 1007 (1985)). The right to academic freedom is not a wide-ranging protection. In *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182 (1990), the petitioner claimed that the First Amendment right to academic freedom protected confidential peer review materials from disclosure to the Equal Employment Opportunity Commission. *Univ. of Pa.,* 493 U.S. at 197. The Court rejected this argument and reaffirmed, in dicta, that the First Amendment right to academic freedom is limited to "attempts to control university speech that [are] *content based*." *Id.* (emphasis added).

Dr. Kaplan alleges that the Individual Defendants arbitrarily violated, and continue to violate, his right to academic freedom "by depriving Dr. Kaplan of his right to conduct research, communicate with his colleagues, and otherwise express himself through the medium of scholarship." DN 19 at 19. Even accepting these allegations as true, Dr. Kaplan's complaint fails to allege a recognized "fundamental right[] of individual freedom" that cannot be deprived through arbitrary and capricious state action. *Gutzwiller*, F.2d at 1328. First, Dr. Kaplan fails to provide the Court, and the Court cannot find, any binding or persuasive authority that recognizes a First Amendment right for a tenured professor at a public university to "conduct research, communicate with [] colleagues, and otherwise express [oneself] through the medium of scholarship." DN 19 at 19. Second, Dr. Kaplan does not contend that the Defendants took issue with the *content* of his

research or scholarship. Rather, Dr. Kaplan claims that he has been denied *access* to the academic infrastructure that he previously utilized to produce speech. Dr. Kaplan's claim would have this Court recognize a novel First Amendment right to access highly specialized and specific academic resources that might speculatively enable him to produce speech in the future. This claim is devoid of any support from precedent, let alone the First Amendment itself, and is without merit. Dr. Kaplan fails to allege a recognized fundamental right and, therefore, has failed to articulate a claim for which substantive due process protections are implicated. Accordingly, his substantive due process claim under § 1983 will be dismissed.

### C.    Dr. Kaplan's Request for Injunctive Relief

As stated above, the Court finds that Dr. Kaplan has failed to plead any viable claims under § 1983. The Court will now address Dr. Kaplan's request for injunctive relief which, based on Dr. Kaplan's amended complaint, the Court interprets to be made in conjunction with those claims. Dr. Kaplan seeks injunctive relief under "federal and state law." DN 15 at ¶ 178–81. The specific relief he seeks is unclear; Dr. Kaplan states that he "will continue to so suffer in violation of his rights unless Defendants are enjoined from such activity by Order of this Court." *Id.* at ¶ 178. While styled as a stand-alone claim in his complaint, Dr. Kaplan asserts that he seeks injunctive relief under *Ex Parte Young.* DN 19 at 12. Regardless, injunctive relief is a remedy, not a separate cause of action. "[A] plaintiff cannot seek such equitable relief where there is no underlying federal claim." *Brown v. Fentress*, No. 3:18-CV-P120, 2018 WL 1972710 at *3 (W.D. Ky. April 26, 2018). There being no viable underlying federal claim, Dr. Kaplan cannot seek injunctive relief as a stand-alone claim. Accordingly, the Court will dismiss his request.

### D.    Dr. Kaplan's Request for Declaratory Relief

Dr. Kaplan also seeks declaratory relief under the Declaratory Judgment Act 28 U.S.C. §§ 2201–2202. DN 15 at ¶ 174–75. He asks the Court to issue a binding declaration of rights that states the following:

> (i) Dr. Kaplan has one or more legally protected property interests or rights in his tenured positions at the University as a clinician, researcher, and/or faculty member, and in his Chair position; (ii) Dr. Kaplan has one or more legally protected liberty interests or rights in his tenured positions at the University as a clinician, researcher, and faculty member, and in his Chair position; (iii) Defendants' actions against Dr. Kaplan violated his federally protected interests or rights in his tenured positions at the University as a clinician, researcher, and/or faculty member, and in his Chair position; and (iv) as a result of Defendants' illegal actions, including his termination as a tenured clinician, researcher, and faculty member, one or more of Dr. Kaplan's legally protected interests or rights were harmed.

*Id.* at ¶ 175.

Under the Declaratory Judgment Act, the "exercise of jurisdiction…is not mandatory." *Bituminous Cas. Corp. v. J&J Lumber Co. Inc.,* 373 F.3d 807, 812 (6th Cir. 2004). The Court must consider five factors to determine whether a case is appropriate for declaratory judgment: "(1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective." *Id.* at 813.

The second factor is dispositive here. As described above, Dr. Kaplan has failed to allege any viable claims under § 1983 against the Defendants. Declaratory relief would not "serve a useful purpose in clarifying the legal relations at issue." *Id.* at 12. Accordingly, the Court will decline to exercise its jurisdiction to grant Dr. Kaplan's requested declaratory relief.

### E.      Dr. Kaplan's Remaining State Law Claims

Dr. Kaplan also brings the following claims under Kentucky law: (1) claims for substantive and procedural due process violations under sections one and two of the Kentucky Constitution, (2) declaratory relief under KRS 418.040, and (3) tortious interference with business relationships and expectancies. DN 15 at ¶ 161–73, 176–77, 182–98. The only basis for this Court's jurisdiction over these claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367. There no longer being a question of federal law before it, the Court declines to accept supplemental jurisdiction over Dr. Kaplan's remaining claims. Accordingly, Dr. Kaplan's remaining state law claims will be dismissed without prejudice.

## V.     Conclusion

For the reasons stated herein, Defendants the University of Louisville, Dean Toni Ganzel, Dr. Ronald Paul, and Dr. Gregory Postel's motion to dismiss (DN 16) will be granted. A separate order will be entered in accordance with this opinion.